In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3294

SCOTTIE PIPPEN,

*Plaintiff-Appellant,*

*v.*

NBCUNIVERSAL MEDIA, LLC, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 8834 — **Sharon Johnson Coleman**, *Judge*.

ARGUED APRIL 19, 2013 — DECIDED AUGUST 21, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Scottie Pippen, who won six
championship rings with the Chicago Bulls and was named
in 1996 to the National Basketball Association's list of the 50
greatest players in its history, has encountered financial re-
verses since his playing days ended in 2004. He has lost
through bad investments a large portion of the fortune he
amassed during his playing days. In an effort to recoup

some of these losses, he has pursued multiple lawsuits against former financial and legal advisors who he believes led him astray. The media caught wind of Pippen's woes, and several news organizations reported that he had filed for bankruptcy. This is false; he has not.

Pippen contends that the false reports have impaired his ability to earn a living through product endorsements and personal appearances. He filed this suit against multiple defendants under the diversity jurisdiction in the Northern District of Illinois, contending that he was defamed and cast in a false light. The district court dismissed the complaint. It found that the falsehoods did not fit within any of the categories of statements recognized by Illinois law to be so innately harmful that damages may be presumed. The district court also concluded that the complaint did not plausibly allege that the defendants had published the falsehoods with actual malice—a term that looks as if it might mean "ill will" but in fact means knowledge the statement is false or reckless disregard of whether it is false. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). Demonstrating actual malice is a requirement for a public figure such as Pippen to recover damages for defamation, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964), and to make out a claim of false light under Illinois law. *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 422–23 (1989).

There are two types of action for defamation. The first, called defamation *per quod*, requires a plaintiff to show that the false statements caused him harm. Some statements, however, expose the subject to such great obloquy that they are actionable without proof of injury. This is defamation *per*

*se*. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501 (2006). Let us begin with the latter type.

Illinois recognizes five categories of defamation *per se*, *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 88–89 (1996), but only two are of interest here: (1) statements that suggest that the subject can't perform his job because of lack of ability or want of integrity, and (2) statements that prejudice the subject in the pursuit of his trade or profession. The difference between the two is subtle. The former seems to imply some sort of on-the-job malfeasance; the latter covers suitability for a trade or profession. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1226 (7th Cir. 1993). Pippen argues that this court has already established in *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527 (7th Cir. 2009), that false accusations of bankruptcy fit into one of these categories.

But the statements at issue in *Giant Screen Sports* were not about bankruptcy; instead, they repeated false accusations that a company willfully defaulted on a credit agreement it was not a party to. The statements depicted the company as one that shirked its contractual obligations; a reader might reasonably think twice about doing business with the company. A similar taint does not attach to the reputation of people who go bankrupt. Many innocent reasons lead to financial distress. Readers of the defendants' statements who mistakenly believe that Pippen is insolvent readily could conclude that his advisers bear the blame.

What's more, Pippen was reported to be personally bankrupt. To succeed under Illinois law without the need to prove injury, he must show that he was falsely accused of lacking ability in his trade or of doing something bad while

performing his job. *Cody v. Harris*, 409 F.3d 853, 857–58 (7th Cir. 2005). Pippen has been employed since he retired from basketball as a goodwill ambassador for the Chicago Bulls, a basketball analyst, and a celebrity product endorser. Bankruptcy does not imply that he lacks the competence or integrity to perform any of these jobs.

Sometimes personal and professional ability or integrity are linked. *Kumaran v. Brotman*, 247 Ill. App. 3d 216 (1993). When the subject of the false statements is employed in an occupation (schoolteacher for example) that requires certain personal traits, such as trustworthiness, accusations of being a scam artist or an inveterate liar could lead to unemployment. Pippen does not contend that his is such a situation. His post-retirement employability derives from his pre-retirement stardom (for his endorsement and appearance work) and basketball knowledge (for his work as an analyst), not his financial prudence or investment savvy. Reports of personal bankruptcy would not so impugn his job performance that they necessarily constitute defamation.

This leaves the second type of defamation (*per quod*). Everything we say about defamation *per quod* applies to the false-light claim as well; we need not mention it again. The district court dismissed these claims after concluding that Pippen had failed to allege special damages in sufficient detail. We think this a mistake. In diversity litigation, the federal rules prevail over any contrary requirements of state practice. *Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980); *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 269 (7th Cir. 1983); *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996). The federal rule, Fed. R. Civ. P. 9(g), says that special damages must be "specifically stated". It can be hard

to know how specific is specific enough, but "specifically" must be something less than the "particularity" standard that Rule 9(b) prescribes for allegations of fraud. We need not probe the meaning of "specifically", because it is enough to identify a concrete loss. *Action Repair, Inc. v. American Broadcasting Cos., Inc.*, 776 F.2d 143, 149–50 (7th Cir. 1985).

Pippen's complaint alleges that his endorsement and personal-appearance opportunities dwindled as a result of the defendants' false reports. In a proposed amended complaint, Pippen itemized losses that in his view flowed from defendants' statements; he identified specific business opportunities that had been available to him earlier but that, following the defendants' statements, were available no more. This is more than a general allegation of economic loss; it is an allegation that third parties have ceased to do business with him because of the defendants' actions. This contention may be substantively inadequate. It appears to be an example of the *post hoc ergo propter hoc* fallacy: since Pippen's opportunities diminished after the statements were made, he believes they must have diminished *because* the statements were made. This theory of causation is weak for professional athletes, whose earnings related to past stardom drop as time passes since their playing days. But, as a matter of pleading, Pippen did enough.

The district court had a second reason, however, and it is stronger. The judge observed that Pippen is a public figure, which he concedes. Thus he must show that the defendants published the defamatory statements with actual malice—in other words, that the defendants either knew the statements to be false or were recklessly indifferent to whether they are true or false. *New York Times*, 376 U.S. at 279–80; *Underwager*

*v. Salter*, 22 F.3d 730, 733 (7th Cir. 1994). States of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants had many ways to learn whether Pippen had filed for bankruptcy. For example, all bankruptcy court dockets can be searched simultaneously through the federal courts' PACER service. And then there's the tried-and-true journalistic practice of asking a story's subject. If rather than relying on the rumor mill the defendants had conducted even a cursory investigation, they would have discovered that Pippen had not declared bankruptcy—and they concede this. But failure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

The Supreme Court also has said that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false. *New York Times*, 376 U.S. at 286. Thus the fact that Pippen alerted the defendants by email *after* publication that he had not entered bankruptcy does not help him establish actual malice at the time of publication. And Illinois has adopted the Uniform Single Publication Act, 740 ILCS 165/1, which provides that a claim for relief for defamation is complete at the time of first publication; later circulation of the original publication does not trigger fresh claims. The Act protects speakers and writers from repeated litigation arising from a single, but mass-produced, defamatory publication.

Pippen argues that the Act does not apply to statements on the Internet, where all defendants made their reportage available. Online publishers do not face the same logistical hurdles or costs in correcting a false statement as their old-media counterparts. Print publishers would need to hunt down every physical copy of a book, magazine, or newspaper in circulation, while Internet publishers can alter their sites with relative ease. In Pippen's view, then, every day that an unaltered defamatory statement remains online after a publisher learns of its falsity constitutes an actionable republication.

Illinois courts have not yet considered how the single-publication rule applies to Internet publications, so our job is to predict how the state's highest court would answer the question if asked. *Giuffre Organization, Ltd. v. Euromotorsport Racing, Inc.*, 141 F.3d 1216, 1219 (7th Cir. 1998). In the absence of any Illinois authority on the question, decisions from other jurisdictions may prove instructive. *Lexington Insurance Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). We conclude that, if presented with the opportunity, the Supreme Court of Illinois would deem the single-publication rule applicable to the Internet.

Every state court that has considered the question applies the single-publication rule to information online. See *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468 (2009); *T.S. v. Plain Dealer*, 194 Ohio App. 3d 30 (2011); *Ladd v. Uecker*, 323 Wis. 2d 798 (App. 2010); *Kaufman v. Islamic Society of Arlington*, 291 S.W. 3d 130 (Tex. App. 2009); *Woodhull v. Meinel*, 145 N.M. 533 (App. 2008); *Churchill v. State*, 378 N.J. Super. 471 (2005); *Firth v. State*, 98 N.Y. 2d 365 (2003). And those federal courts that have addressed the topic have concluded that the

relevant state supreme court would agree. See *Shepard v. TheHuffingtonPost.Com, Inc.*, 509 F. App'x. 556 (8th Cir. 2013) (Minnesota law) (nonprecedential); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174–75 (3d Cir. 2012) (Pennsylvania law). Pippen does not alert us to any authority supporting his view, and we have found none.

The theme of these decisions is that excluding the Internet from the single-publication rule would eviscerate the statute of limitations and expose online publishers to potentially limitless liability. This same concern previously led courts to apply the single-publication rule to books. They did so despite the fact that book publishers have greater post-publication control over the circulation of their content than do newspaper publishers. See *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 124–26 (1948); *Kilian v. Stackpole Sons, Inc.*, 98 F.Supp. 500, 503–04 (M.D. Pa. 1951). All copies of a single newspaper edition are made available to the public on one day; in contrast, book publishers hold stock in reserve and release batches to the public over months or years. In Pippen's view, the single-publication rule ought not have been extended to book publishers because they could pulp the books they kept in stock, while newspaper publishers had no leftover stock to destroy. But no court saw it that way, and no court has been persuaded that the even greater control that Internet publishers have over their content—and the much lower cost of editing or deleting that content—is a reason to exclude them from the Act's coverage. Indeed, courts have drawn the opposite conclusion: the Internet's greater reach comes with an "even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants." *Firth*, 98 N.Y. 2d at 370; see

also, e.g., *Churchill*, 378 N.J. Super. at 480–81. All the more reason that the single-publication rule should apply.

A publisher's degree of control over its content does not matter to Illinois's test for whether redistribution of a de-famatory statement amounts to a republication. Instead, courts must ask whether the "act of the defendant [was] a conscious independent one". *Winrod v. Time Inc.*, 334 Ill. App. 59 (1948); see also *Dubinksy v. United Airlines Master Executive Council*, 303 Ill. App. 3d 317, 333–34 (1999); *Founding Church of Scientology v. American Medical Association*, 60 Ill. App. 3d 586, 589 (1978). Courts have grappled with what degree of affirmative act constitutes a republication. See *Canatella v. Van De Kamp*, 486 F.3d 1128, 1135–36 (9th Cir. 2007); *Yaeger v. Bowlin*, 693 F.3d 1076, 1083 (9th Cir. 2012). The defendants in those cases changed the URL where the statements were posted but left the statements unaltered. In *Firth*, the defendants added an unrelated story to the web page hosting the allegedly defamatory statement. 98 N.Y. 2d at 367. None of those acts was sufficient to count as a repub-lication. Pippen does not contend that the defendants took any action beyond initially posting the stories to their web sites, and we conclude that Illinois would deem the passive maintenance of a web site not a republication.

AFFIRMED