NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0490n.06

**No. 14-5709**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 08, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| COREY D. CLARK; JAERED ANDREWS, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| VIACOM INTERNATIONAL INC.; VIACOM | ) | COURT FOR THE MIDDLE |
| MEDIA NETWORKS; VIACOM, INC.; JIM | ) | DISTRICT OF TENNESSEE |
| CANTIELLO; | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: GRIFFIN and STRANCH, Circuit Judges; and STEEH, District Judge.*

GRIFFIN, Circuit Judge.

Almost a decade after Corey Clark and Jaered Andrews were publicly disqualified from participating on the television show *American Idol*, they filed a variety of defamation-related claims over statements contained in several online news articles that, over the years, had referenced their disqualifications. Ultimately, the district court dismissed all of the claims asserted in the complaint.

This appeal raises two central questions. First, does the pertinent one-year statute of limitations permit Clark and Andrews to assert defamation claims with respect to statements that were posted to publicly accessible websites before the one-year limitations period but have

---

*The Honorable George Caram Steeh III, United States District Judge for the Eastern District of Michigan, sitting by designation.

remained continuously accessible to the online public since then?  And if not, have Clark and Andrews sufficiently pled defamation claims with respect to the statements that do fall within the limitations period?  The answer to both questions is "no."  We therefore affirm the judgment of the district court.

I.

Ten years after his appearance in 2002 as a contestant on *American Idol*, Corey Clark filed a federal-court diversity action, alleging that numerous online statements made in MTV News and VH1 articles written by Jim Cantiello and other authors had defamed him and otherwise tortiously injured him over the preceding decade.  His suit named Cantiello, MTV, and Viacom as defendants (collectively, "Viacom").  Viacom filed a motion to dismiss.  In response, Clark filed a first amended complaint, which Viacom again moved to dismiss.

Clark then requested leave to file a second amended complaint with additional plaintiffs—one of whom was Jaered Andrews, a fellow ex-*Idol* contestant—and the district court granted leave to amend.  Viacom, however, moved the district court to reconsider that decision. In response, the district court withdrew leave for Clark to file the second amended complaint, concluding that the amendment would be futile because the additional claims depended upon numerous of Viacom's statements that had occurred before the one-year statutory limitations period.  In reaching this conclusion, the district court rejected Clark's assertions that online defamation constitutes a "continuous wrong," held that Tennessee's so-called "single publication rule" applied to online speech, and concluded that the online statements in question had not been republished in a manner that reset the statute of limitations.

Clark, in turn, moved the district court to reconsider its decision yet again, contending that at least some of the claims alleged in the second amended complaint were not time-barred

even under the district court's analysis. Again the pendulum swung, this time back in Clark's favor: the district court agreed that its first-stage reconsideration had been partially hasty, given that "some of [the] claims in the proposed second amended complaint are viable," and it therefore gave "[a]ny Plaintiff with an undisputed timely claim" twenty days in which to file a second amended complaint.

The plaintiffs—now including both Clark and Andrews—filed two of them, the latter superseding the former. To this complaint (which is technically the fifth complaint filed in the case), plaintiffs attached over 1,300 pages of exhibits.

According to the complaint, *American Idol*—a television show broadcasted and produced by FOX Broadcasting Company beginning in 2002—is a televised talent contest for singers whose winner is determined by the viewing audience, individual members of which may vote for his or her preferred singer via text message or telephone. Soon after its launch, the show became "the highest-rated and most popular television program in U.S. history."

More than seventy thousand singers publicly auditioned for Season Two of *American Idol* in the fall of 2002. Clark was one of them, and he did better than most. Having successfully survived all of the initial qualification rounds, Clark performed live on *American Idol* and was voted by the show's audience—numbering in the millions—to the finals as one of the top twelve contestants.

But Clark's fame soon was supplanted by infamy. Shortly after his ascent into the public eye, internet publication *The Smoking Gun* reported that Clark had recently been arrested and charged with battery and criminal restraint for an altercation involving his younger sister. Later that day, FOX issued a press release, which Clark's complaint quotes at length:

Due to events that have recently come to light, *American Idol* participant Corey Clark has been removed from the contest.

All participants are required to provide full and accurate information to assist in background checks, including disclosure of any prior arrests. Corey withheld information about a prior arrest which, had it been known, might have affected his participation in the show. Due to his failure to disclose, compounded by an error in a police report which misspelled Corey's name, the incident was not discovered during the background check. The producers and network feel that Corey's behavior warrants his disqualification.

Unfortunately, the search process is not perfect. We regret the error, but the only thing we can do is learn from the incident, continue to improve the background check process, and move on.[1]

Clark's complaint admits that he was in fact arrested and charged with the crimes in question, although he asserts that the charges were based on a misunderstanding—he was protecting his sister, not assaulting her. The complaint also asserts that, while he was competing on *American Idol*, he engaged in a sexual affair with one of the show's judges, Paula Abdul—an allegation that later spawned an ABC *Primetime* special. "Had [Clark] not been disqualified," alleges the complaint, "there is [a] strong probability that he would have won Season Two of *American Idol*." The criminal charges filed against him were later dismissed.

Andrews also was a contestant on Season Two of *American Idol*. He, too, was selected from an alleged 70,000-strong swarm and advanced to the semi-final round, which was composed of only thirty-two remaining contestants. Shortly before he was due to compete in the semi-final round, however, he was disqualified from the contest. According to the complaint, Andrews informed a local news outlet shortly after his disqualification that he likely had been "dropped from the show for 'witnessing' [a man's] death." Andrews was referring to an incident

---

[1]Plaintiffs allege that multiple FOX-owned entities—including but not limited to FOX Television and the *American Idol* producers—made statements concerning plaintiffs that were later reprinted by other non-FOX media outlets, including Viacom.

that had occurred only two months before his disqualification, when, according to his complaint, he was involved in a fight during which his antagonist was killed. Andrews was later charged with misdemeanor assault for his role in the death but was acquitted at trial.

Given their public profile, numerous media outlets reported on Clark's and Andrews's departures from the show. Apart from various statements posted online prior to the one-year limitations period, only three assertedly defamatory statements—made in articles written between July 2011 and May 2012 for MTV News on a website owned and operated by Viacom—are pertinent to this appeal. The allegedly defamatory phrases are emphasized:

- A July 6, 2011, article describing the subsequent careers of ninth-place *American Idol* finishers from previous seasons stated, "Season Two: Corey Clark: Believe it or not, the controversial Clark—*who was disqualified for lying about a hairy domestic dispute* and later claimed to have had an affair with Paula Abdul—was once a part of the Universal Music Group, (which includes Interscope Records). His 2005 self-titled debut album— independently produced but distributed by Universal—boasted a Black Eyed Peas cameo and production by one of the top producers at that time, Scott Storch. Seriously."

- A March 14, 2012, article reporting the disqualification of *American Idol* Season Eleven top twelve finisher Jermaine Jones observed that Jones "is just the latest *Idol* finalist to run afoul of producers for his rap sheet. During season two, *Corey Clark was booted for concealing his arrest record on battery charges, as was semi-finalist Ja[e]red Andrews, who was sent home over undisclosed assault charges*."

- A May 23, 2012, article recapping Season Eleven of *American Idol* presented "the first-ever *American Idol* awards, a dubious set of distinctions that honor some of the things— and folks—we loved most about the show. And the ones we totally hated, too." One of the "awards" was bestowed upon Season Eleven contestant Jermaine Jones: "*The Corey Clark/Frenchie Davis Award for Past Indiscretions*: From the moment he showed up in the audition episodes, there was something . . . *special* about enormous crooner Jermaine Jones, and we're not just talking about his ability to sweat and cry at the same time. *And when the top 12 finisher got booted for not disclosing his rap sheet, our suspicions were confirmed*."

Relevant to this appeal, Clark's and Andrews's complaint asserted claims for defamation, false light invasion of privacy, and a claim that Viacom negligently hired and retained Cantiello, who authored some of the statements in question. Just as it had with the previous versions of

plaintiffs' complaints, Viacom moved to dismiss their latest complaint under Federal Rule of Civil Procedure 12(b)(6).

The district court granted the motion and dismissed each of plaintiffs' claims. After reiterating its statute-of-limitations reasoning, the district court dismissed the defamation claims because the statements in question were not actionably false. *Clark v. Viacom Int'l, Inc.*, No. 3:12-0675, 2014 WL 1934028, at \*14 (M.D. Tenn. May 13, 2014). The district court elaborated that, in its view, the statements were actually true, based on similar stories that had been reported "by other reputable news organizations." *Id.* The district court also dismissed the false-light and negligent-retention claims. *Id.* at \*16–\*17.

Clark and Andrews filed this appeal.

## II.

The parties' first dispute is whether the district court properly denied in part Clark's and Andrews's motion to file their proposed second amended complaint. Where the district court's denial of such a motion turns upon a legal determination, such as that the amendment would be futile, "[o]ur review of that legal supposition—and, therefore, of the denial of the motion to amend—is de novo." *Williams v. City of Cleveland*, 771 F.3d 945, 949 (6th Cir. 2014).

Where a proposed amendment could not withstand a Rule 12(b) motion to dismiss, a district court may properly deny the amendment as futile. *See Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). Although the statute of limitations is an affirmative defense, it nevertheless may support a Rule 12(b) dismissal if there is no question, given the complaint's facial allegations, that the defense applies. *See Jones v. Bock*, 549 U.S. 199, 215 (2007). Thus, where the proposed amended complaint's allegations demonstrate on their face that the applicable statute of limitations bars the claims that the amendment asserts, the

district court may properly deny leave to amend as futile. *See 500 Assocs., Inc. v. Vermont Am. Corp.*, 496 F. App'x 589, 593 (6th Cir. 2012); *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1104 (6th Cir. 1995).

Tennessee requires that defamation claims be brought within one year after "the date the alleged defamatory language was published." *Riley v. Dun & Bradstreet, Inc.*, 172 F.2d 303, 308 (6th Cir. 1949); *see* Tenn. Code § 28-3-104(a)(1). Clark and Andrews requested leave to amend their complaint to allege defamation claims with respect to statements whose initial publication on Viacom's publicly accessible news website occurred more than one year before plaintiffs filed the suit against Viacom. Citing futility, the district court denied Clark and Andrews leave to do so.

Clark and Andrews argue that the district court's futility ruling was incorrect for two reasons. First, they contend that the defamatory statements cause "continuing wrong" to them, due to the fact that the statements that have been published on the internet are functionally immortal and may continue to be viewed by third parties possibly in perpetuity. And second, they argue that, in any event, Viacom "republished" the defamatory statements in question, thereby restarting the limitations period. On these issues of state law, this court "is obligated to apply the law it believes the highest court of the state would apply if it were faced with the issue." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013) (citation omitted); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). We agree with Viacom that the Tennessee courts would not decide these questions in plaintiffs' favor.

A.

The first of plaintiffs' arguments may be readily dispatched. "Tennessee courts have never recognized a 'continuing defamation.'" *Rose v. Cookeville Reg'l Med. Ctr.*, No. M2007–

02368–COA–R3–CV, 2008 WL 2078056, at *5 (Tenn. Ct. App. May 14, 2008); *see Ward v. Knox Cnty. Bd. of Educ.*, 869 F. Supp. 2d 860, 870 (E.D. Tenn. 2012). And there is a good reason for that antipathy: the argument that statutes of limitations are inapplicable whenever there is a possibility for further reputational harm does not fit comfortably with Tennessee's historical treatment of limitations periods in defamation cases. Tennessee has rejected arguments that it insufficiently protects a plaintiff from reputational harm generally to adopt the moment of publication as the time at which a defamation claim accrues. *See Applewhite v. Memphis State Univ.*, 495 S.W.2d 190, 194–95 (Tenn. 1973). It has also held that the discovery rule—which tolls the limitations period—applies to libel claims only when the publication is "secretive or inherently undiscoverable." *Ali v. Moore*, 984 S.W.2d 224, 228 (Tenn. Ct. App. 1998) (citation omitted). *See also Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994) (rejecting "discovery rule" for slander claims). Tennessee therefore fully accepts the possibility that limitations principles may bar a libeled plaintiff from recourse, even where the libel continues to cause reputational harm.

Nor is plaintiffs' position supported by the rationale underlying prototypical applications of the continuing tort doctrine. The doctrine generally applies where a plaintiff's injury is caused by cumulative exposure over time to instances of conduct that do not individually suffice to give rise to compensable detriment; that is, "where there is no single incident that can fairly or realistically be identified as the cause of significant harm." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) (internal quotation marks omitted). In Tennessee, for example, the seminal case involved an employee who was disabled after breathing chemical particles in his employer's facility over a long period of time. *See Stanbury v. Bacardi*, 953 S.W.2d 671, 675 (Tenn. 1997) (explaining the "continuing tort" doctrine in Tennessee jurisprudence and citing *Tenn. Eastman*

*Corp. v. Newman*, 121 S.W.2d 130, 135 (Tenn. Ct. App. 1938)). Reputational injury, by contrast, may generally be traced to a discrete cause occurring at an identifiable moment in time: the publication to a third party of a reputationally harmful statement. *See Applewhite*, 495 S.W.2d at 194 (adopting single publication rule). Even when an allegedly defamatory statement is publicly accessible for a lengthy period of time, such that it is sequentially encountered by numerous third parties, the plaintiff must link his reputational injury to discrete instances of publication. *See id.* at 194–95. Because defamation claims turn upon individual instances of publication rather than upon a generalized or cumulative effect, the continuing tort doctrine does not neatly graft onto the defamation analysis. As a result, courts have generally refused to apply the doctrine to defamation claims. *See Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (applying District of Columbia law); *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 710 (10th Cir. 2012) (construing Wyoming law); *Flowers*, 310 F.3d at 1126 (construing Nevada law).

We conclude that the Tennessee Supreme Court would not diverge from the majority trend and adopt the "continuing tort" theory in the defamation context. Plaintiffs' argument to the contrary is without merit.

B.

Plaintiffs' second line of argument takes a different tack, contending (1) that the so-called "single publication rule" does not apply to online statements; and (2) that, even if it does, the one-year limitations period has been continuously reset because Viacom has repeatedly republished the allegedly defamatory statements on its website. We disagree with Clark and Andrews. Stale statements are not perpetually actionable under Tennessee defamation law solely because they continue to be available to the online public.

1.

The first portion of plaintiffs' argument asserts that the "multiple publication rule," rather than the "single publication rule," applies to statements posted to online websites. As Tennessee's highest court has observed, the two different rules reflect two different ways to balance the competing considerations that are implicated by the statute of limitations: notice and finality. *See Applewhite*, 495 S.W.2d at 195. On the one hand, a plaintiff ordinarily should not be expected to sue until he has reason to know that a libel has been published about him; a too-brief and too-strict limitations period would permit a speaker to make a very limited initial publication of a defamatory statement, wait out the limitations period, and then republish the defamatory statements in a mass communication with impunity. *See id.* at 195–96. But on the other hand, a publisher should not remain potentially liable into perpetuity for everything that he has previously written down; even false historical statements at some point deserve legal repose. *See id.* at 194.

The traditional common-law approach—known as the "multiple publication rule"—did not accommodate a mass publisher's interest in finality. Under traditional common-law principles, a defamatory statement generally is "published" whenever it is transmitted to a third party, meaning that a new defamation claim arises for every copy of a mass publication that makes its way from the speaker into the hands of a third party. *See id.* at 193; *Gregoire v. G. P. Putnam's Sons*, 81 N.E.2d 45, 47 (N.Y. 1948). The genesis of this rule is often traced to a nineteenth-century English case, *Duke of Brunswick v. Harmer*, (1849) 14 Q.B. 185, 117 Eng. Rep. 75—a case that is also routinely cited as illustrating the shortcomings of its approach. *See Christoff v. Nestle USA, Inc.*, 213 P.3d 132, 138 (Cal. 2009); *Applewhite*, 495 S.W.2d at 193; *Gregoire*, 81 N.E.2d at 47. In *Duke of Brunswick*, an agent of the Duke purchased a seventeen-

year-old copy of a newspaper containing libelous statements about him. 14 Q.B. at 187, 117 Eng. Rep. at 76. Despite the fact that the newspaper had initially been printed well before the applicable six-year statutory limitations period, the court held that the libelous statements had been "published" to the Duke's agent (the necessary third party) at the moment of sale, thereby giving rise to a new defamation claim within the limitations period. 14 Q.B. at 188–89, 117 Eng. Rep. at 76–77. Under the multiple publication rule, in other words, a plaintiff could evade the limitations period through the ruse of exposing a decades-old copy of a mass publication to his own agent—an approach that rendered the statute of limitations functionally a dead letter.

*Duke of Brunswick*'s multiple publication rule did not survive into the modern era. *See Christoff*, 213 P.3d at 138–40; *Gregoire*, 81 N.E.2d at 47. The problem, as modern courts observed, was that the multiple publication rule "had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book" and would also toll the statute of limitations "indefinitely, perhaps forever," thereby threatening mass publishers with a double-edged sword: "unending and potentially ruinous liability as well as overwhelming (and endless) litigation." *Christoff*, 213 P.3d at 138 (citations omitted).

In 1973, Tennessee formally recognized that *Duke of Brunswick*'s multiple publication rule was out of sync with modern mass communication technologies and joined the majority of other states in adopting the "single publication rule." *Applewhite*, 495 S.W.2d at 193–94. Under the single publication rule, any mass communication that is made at approximately one time—such as a television broadcast or a single "edition of a book, newspaper, or periodical"—is construed as a single publication of the statements it contains, thereby giving rise to only one

cause of action as of the moment of initial publication, no matter how many copies are later distributed. *Id.* at 194; *see* Restatement (Second) of Torts § 577A, cmt. c (1977).[2]

As is evident, the single publication rule reflects a conscious rejection of *Duke of Brunswick*'s disregard for the necessity of finality in the mass communications context. Given "the contemporary publishing world where large numbers of copies of a book, newspaper, or magazine are circulated," Tennessee applies in the realm of print media a rule that is intended to eliminate the "harassment" of publishers that would chill mass communication practices and is therefore "far more suited to contemporary life" than *Duke of Brunswick*'s multiple-publication-rule regime. *Applewhite*, 495 S.W.2d at 193–94.

Acknowledging that Tennessee has adopted the single publication rule in the print domain, Clark and Andrews nevertheless assert that Tennessee would instead apply the multiple publication rule to statements that are posted to publicly accessible, online websites. We disagree. Given the policy considerations driving Tennessee's adoption of the single publication rule in the context of print-based mass communications, it would be highly unusual if Tennessee resuscitated *Duke of Brunswick*'s regime in the online context. If it did, then the possibility of defamation liability would hover over any publicly available online statement regardless of its age as long as a plaintiff could find a third party who had not previously seen it. That, as a functional matter, would make the statute of limitations irrelevant in the online defamation

---

[2]Although Tennessee has slightly adapted the rule by using geography as a proxy for notice—running the statutory period from "the first time a publication is distributed in the county where the action is brought," *Applewhite*, 495 S.W.2d at 195—the distinction makes no difference in the event of an aggregate communication like the online publications here, where there is no question that the first instance of publication disseminated the online statements within the county encompassing the district court. *See also Ali*, 984 S.W.2d at 228 (applying the discovery rule to defamation claims for reasons paralleling those undergirding *Applewhite*'s county-specific rule).

context—an approach that would contradict the finality interests that were central to Tennessee's rejection of the multiple publication rule for the modern mass communications era.

Other jurisdictions have made the same point. The leading case is *Firth v. State*, 775 N.E.2d 463 (N.Y. 2002), which observed that the single publication rule makes even more sense in the online context than in the traditional print media context:

> [If applied to the internet,] a multiple publication rule would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants. Inevitably, there would be a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise.

*Id.* at 466. After *Firth*, no other court in the country has failed to extend the single publication rule to the online domain. *See, e.g.*, *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615–16 (7th Cir. 2013) (citing cases); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012); *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1130–33 (9th Cir. 2006). *See also* Note, *The Single Publication Rule and Online Copyright: Tensions Between Broadcast, Licensing, and Defamation Law*, 123 Harv. L. Rev. 1315, 1321 n.40 (2010).

The only case that marginally supports plaintiffs' argument is an unpublished opinion from the Tennessee Court of Appeals, which held that the single publication rule did not apply to information stored in a private, confidential information database that could be accessed only by certain entities in the health care industry. *See Swafford v. Memphis Individual Practice Ass'n*, No. 02A01-9612-CV-00311, 1998 WL 281935, at *1 (Tenn. Ct. App. June 2, 1998). But *Swafford* itself recognized that it did "not address a situation in which the information in the Data Bank could be accessed by the general public" and therefore did not involve an "*aggregate publication.*" *Id.* at *8 & n.8.

In contrast to the private database entries at issue in *Swafford*, this case involves mass communications on a publicly accessible news website. Almost any statement posted to a generally accessible website shares in the characteristics of an aggregate communication due to its presumptively extensive audience, and the articles at issue here are no exception. No court in Tennessee has cited *Swafford*'s single-publication-rule analysis, and every court in the country that has considered *Swafford* has observed that its holding does not apply to information that is available online to the general public. *See, e.g.*, *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 143 (5th Cir. 2007); *Canatella v. Van De Kamp*, 486 F.3d 1128, 1136 (9th Cir. 2007); *Churchill v. State*, 876 A.2d 311, 318 (N.J. Super. Ct. App. Div. 2005). *See also Rare 1 Corp. v. Moshe Zwiebel Diamond Corp.*, 822 N.Y.S.2d 375, 377 (N.Y. Sup. Ct. 2006) (subjecting to single publication rule even a private, "fee-based, commercially created website designed to facilitate networking within a professional community.").

We conclude that the Tennessee Supreme Court would not reverse course on the policy principles noted in its controlling defamation jurisprudence, especially in order to stand alone against national consensus. "[T]he multiple publication rule pre-dates the development of the light bulb." Bríd Jordan, *The Modernization of English Libel Laws and Online Publication*, 14 J. Internet L. 3, 5 (2011). Even the United Kingdom—which was responsible for the multiple publication rule in the first place, *see Duke of Brunswick*, 14 Q.B. at 185, 117 Eng. Rep. at 75— has recently altered its approach. *See* Defamation Act, 2013, c. 26, § 8 (Eng.) (establishing a single publication rule as of January 1, 2014). We cannot agree with plaintiffs that Tennessee would regulate online discourse in the twenty-first century with legal tools that are tuned to the communications technologies of the nineteenth.

2.

Anticipating that the single publication rule may apply to online speech, Clark and Andrews assert that Viacom nevertheless repeatedly "republished" the statements in question, thereby restarting the limitations period. This strand of their argument relies upon the principle that, notwithstanding the single publication rule, the statute of limitations resets where the speaker republishes the defamatory statement, such as "in a later edition of a book, magazine or newspaper." *Firth*, 775 N.E.2d at 466. The rule applies as long as the new iteration of the statement "is not merely a delayed circulation of the original edition." *Id.* (internal quotation marks omitted).

The general rationale behind the rule is that if the speaker affirmatively says the same thing again at a later time to a new audience, then he has intended to engender additional reputational harm to the plaintiff. *Id.* In the traditional print context, the critical consideration is not whether the substance of the statement has changed. Instead, the key factor is whether the speaker "intended to and does reach a new [audience]." Restatement (Second) of Torts § 577A, cmt. d; *see* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 7:2.1 (4th ed. 2010). Thus, a rebroadcast of a television show, a reprint of a magazine article, or a new edition of a book—even if substantively identical to the initial iteration (such as a paperback edition of a previously published book, *see, e.g.*, *Rinaldi v. Viking Penguin, Inc.*, 420 N.E.2d 377, 382 (N.Y. 1981))—generally will reset the limitations period, because each is produced to garner an audience that the preexisting dissemination of the statement could not reach. *See* Restatement (Second) of Torts § 577A, cmt. d.

Application of the republication doctrine quickly becomes complicated in the online context. Because online fora and content delivery systems are frequently altered, many courts

have struggled to parse whether specific technological changes in the format and delivery of allegedly defamatory statements have functioned to republish the statements to new audiences, thereby resetting the limitations period. Generally, the courts agree that republication must at least involve an "affirmative act," *Pippen*, 734 F.3d at 616, and have concluded that statements posted to a generally accessible website are not republished by conduct such as the following:

- a third party's posting the statement elsewhere on the internet, *see Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007);

- passively maintaining the website to which the defamatory statement is posted, *see Pippen*, 734 F.3d at 616; *Oja*, 440 U.S. at 1132; *Ladd v. Uecker*, 780 N.W.2d 216, 220 (Wis. Ct. App. 2010);

- failing to remove a statement from a website after receiving notice of its falsity, *see Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1167–68 (9th Cir. 2011);

- adding an unrelated story to the web page that hosts the allegedly defamatory statement, *see Firth*, 775 N.E.2d at 466–67;

- creating hypertext links to previously published statements, *see In re Philadelphia Newspapers*, 690 F.3d at 174–75 (collecting cases);

- revising other information at the URL at which the allegedly defamatory statement is found, but leaving the statement itself intact, *see Yeager v. Bowlin*, 693 F.3d 1076, 1083 (9th Cir. 2012);

- updating a website's user interface to give visitors additional avenues to access the allegedly defamatory statements, *see Churchill*, 876 A.2d at 319; or

- changing the URL at which the allegedly defamatory statement was posted (*i.e.*, posting the statement verbatim to a new URL), *see Canatella*, 486 F.3d at 1134–35.

This catalogue of outcomes tracks the traditional touchstone of the republication doctrine: that the test of whether a statement has been republished is if the speaker has affirmatively reiterated it in an attempt to reach a new audience that the statement's prior dissemination did not encompass. *See Firth*, 775 N.E.2d at 466; Restatement (Second) of Torts § 577A, cmt. d. After all, a reiterated statement generates new reputational harm only if the statement is repeated with

an intent and ability to expand its dissemination beyond its previous limits—such as by rebroadcasting a television show or printing a paperback edition of a previously published book. *See, e.g.*, *Rinaldi*, 420 N.E.2d at 382. *See also Cook v. Conners*, 109 N.E. 78, 79 (N.Y. 1915) (noting that publishing the same statement in two different newspapers constituted two "distinct publication[s]" because "[p]ersons would read or acquire knowledge of [the statement] from or through either paper who would not do so through the other").

Difficult questions arise with respect to online statements that were initially published only to limited audiences—perhaps behind a paywall, or available only to social media users privileged to access the posting, or available only through a fee- or privilege-based application or other content delivery system—and then later disseminated to a wider group of third parties or the general public. *Cf. Applewhite*, 495 S.W.2d at 195–96. If the delivery of the online statement is intentionally changed in a manner that enables it to be consumed by a wider audience than before, then it has potentially been republished. *See Firth*, 775 N.E.2d at 466; *Rinaldi*, 420 N.E.2d at 382.

But for statements like those at issue in this case, which were initially posted to a prominent, publicly accessible news website, the analysis is much more straightforward. Several courts have observed that a statement posted to such a forum is not republished as long as any alterations to its online presence do not relate to its substance. *See, e.g.*, *In re Philadelphia Newspapers*, 690 F.3d at 174. Because a materially substantive change to the statement generally would amount to a new potentially defamatory publication in its own right, the courts' reference to substantive alterations is shorthand for the recognition that the republication doctrine focuses upon audience recruitment. *See Firth*, 775 N.E.2d at 466. Statements that are posted to a forum that is prominently accessible to the online public have a presumptively global audience,

and subsequent alterations of format—such as shifting the statement between URLs or moving it from one portion of a webpage or server to another—are not likely to have a measurable effect on the statements' ability to be accessed by a new band of viewers. Because the initial posting has already been directed at most of the universe of probable interlocutors, there is not likely to be any need for a digital equivalent of a rebroadcast or a second print run. *See* Restatement (Second) of Torts § 577A, cmt. d. Nor does the republication doctrine apply where audience attention is directed toward the allegedly defamatory statements' preexisting dissemination. *See In re Philadelphia Newspapers*, 690 F.3d at 174–75 (hyperlinking to a prior statement does not republish it); *Rinaldi*, 420 N.E.2d at 381 (explicating *Gregoire*, 81 N.E.2d at 49). Thus, run-of-the-mill hyperlinks, website updates, or interface redesigns typically demonstrate neither the intent nor the ability to garner a wider audience than the initial iteration of the online statement could reach. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 690 F.3d at 175; *Firth*, 775 N.E.2d at 466–67. *See also T.S. v. Plain Dealer*, 954 N.E.2d 213, 215 (Ohio Ct. App. 2011) (declining to find republication even where the defendant made a previously published print article newly available online).

It follows that Clark and Andrews are incorrect that Viacom has "republished" the statements in question simply by keeping them continuously available on its website. *See Pippen*, 734 F.3d at 616. Nor are they correct that the statements have been republished by virtue of the fact that the commercial advertisements around the articles' borders are continuously updated. Beyond the fact that third-party ad servers, not Viacom, are likely responsible for the advertisements' shifting content, *cf. id.* (passivity cannot result in republication), an online statement is not republished every time that its window dressing is altered. *See Yeager*, 693 F.3d at 1083; *Canatella*, 486 F.3d at 1134–35; *Churchill*, 876 A.2d at

319; *Firth*, 775 N.E.2d at 466–67. Simply alerting a new audience to the existence of a preexisting statement does not republish it. *See In re Philadelphia Newspapers*, 690 F.3d at 174–75; *Rinaldi*, 420 N.E.2d at 381. And, in any event, there is no dispute that the advertisements that frame Viacom's online articles are not attempting to recruit a new audience for the articles; in fact, they are intended to divert the articles' existing audience to the advertisements' sponsors. In these circumstances, the republication doctrine does not apply. *See Firth*, 775 N.E.2d at 466; Restatement (Second) of Torts § 577A, cmt. d. Finally, if the opposite rule was adopted, then—given the contemporary world of targeted online advertising—there would be no statute-of-limitations defense for any defamatory statement published on any website employing twenty-first-century advertising techniques. These are precisely the policy concerns that have consistently driven the courts away from adopting similar constructions of the republication doctrine. *See, e.g.*, *In re Philadelphia Newspapers*, 690 F.3d at 175; *Jankovic*, 494 F.3d at 1087; *Firth*, 775 N.E.2d at 467.

At its core, plaintiffs' republication argument is a reprise of their attack on Tennessee's decision generally to favor finality over competing considerations in its defamation statute-of-limitations jurisprudence. We conclude that the Tennessee Supreme Court would not vary on these facts from its historically consistent approach. The district court was correct to partially deny leave to amend on the basis of futility.

III.

Given that Clark and Andrews cannot predicate defamation claims on any of Viacom's statements that predate the one-year limitations period, the remaining issue is whether Clark and Andrews have sufficiently pled defamation claims with respect to the few statements that do fall within the appropriate timeframe. We review the district court's Rule 12(b)(6) dismissal de novo

to ascertain whether the facts alleged generate a plausible claim to relief under some viable legal theory. *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). We agree with Viacom that the complaint at issue here is self-contradictory and has therefore failed to plausibly allege falsity.

A.

Recognizing that "the Supreme Court of the United States has constitutionalized the law of libel and, in material particulars, has preempted state statutory and decisional law in cases and controversies involving the communications media," Tennessee has incorporated the federal constitutional analysis into its state-law defamation principles. *Press, Inc. v. Verran*, 569 S.W.2d 435, 440 (Tenn. 1978); *see also Hibdon v. Grabowski*, 195 S.W.3d 48, 60–61 (Tenn. Ct. App. 2005). Although there is some suggestion that Tennessee's protection of free speech and the free press may be even more extensive than what is required under the federal constitution, *see Press*, 569 S.W.2d at 442, it is in any event beyond dispute that Tennessee's defamation law cannot be more intrusive than the First Amendment allows. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 & n.6 (6th Cir. 2013).

The most basic feature of a Tennessee state-law defamation claim is that it does not apply to truthful assertions, no matter how reputationally harmful they might be. *See Press*, 569 S.W.2d at 442; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515–16 (1991). Even in the limited circumstances when statements are deemed actionable despite being technically accurate in isolation, defamation liability lies only if, when viewed as a whole, the literally true statements convey an overall meaning that is false. *See Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978); *see also Martin v. Hearst Corp.*, 777 F.3d 546,

552–53 (2d Cir. 2015). If the meaning conveyed by the statements is not false, they cannot give rise to a defamation claim.

Nor may a speaker incur defamation liability if she does not purport to say something verifiable about the plaintiff. The First Amendment prohibits punishing someone for expressing an idea. *Snyder*, 562 U.S. at 458; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). Thus, the falsity requirement is met only if the statement in question makes an assertion of fact—that is, an assertion that is capable of being proved objectively incorrect. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (citation omitted). If, by contrast, the statement is not "sufficiently factual to be susceptible of being proved true or false"—because, for instance, it is "loose, figurative, or hyperbolic language" or a statement of opinion that does not reasonably imply a false assertion of fact—then it may not form the basis of a state-law defamation action. *Id*. at 21 (citation omitted); *Seaton*, 728 F.3d at 597.

Even if a statement does include "[m]inor inaccuracies," defamation law tolerates some margin of error: a flawed assertion of fact is not actionable as long as it is "substantial[ly] true." *Masson*, 501 U.S. at 517. The factual flaw must concern "the substance, the gist, the sting" of the statement, *id*. (citation omitted), such that the statement carries a different meaning—"a different effect on the mind of the reader," *Memphis Pub. Co.*, 569 S.W.2d at 420 (citation omitted)—than would have been conveyed without the error.

Whether the plaintiff is required to prove falsity as opposed to truth depends upon whom and what the statement is about. Where a statement is about a public figure or relates to a matter of public concern, the First Amendment does not permit state defamation law to place the burden on the defendant to prove that the statement was true. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–76 (1986). That is because placing the burden of proof on the defendant

would render a speaker liable for a statement that contributes to public discourse even where the evidence of the statement's truth is at an equipoise. *Id*. at 776. If the truth or falsity of public commentary cannot be determined, the First Amendment requires that the scales be "tip[ped] . . . in favor of protecting true speech." *Id.* Thus, even if state defamation law ordinarily shields a defendant from liability only where she is able to prove truth as an affirmative defense, *see, e.g.*, *Memphis Pub. Co.*, 569 S.W.2d at 420, the federal Constitution requires that a defamation plaintiff plead and prove that a statement on a matter of public concern or relating to a public figure is false. *Hepps*, 475 U.S. at 776.[3]

B.

Regardless of which party must ultimately prove falsity, *see Hepps*, 475 U.S. at 775–76, any defamation plaintiff must allege it. *See Press*, 569 S.W.2d at 442. In this unusual case, plaintiffs have failed to do so.

The root of the problem is plaintiffs' failure to recognize how limited in scope the challenged statements are. The first step in any defamation analysis is to determine which

---

[3]Viacom has not argued that Clark's and Andrews's attempts to achieve national renown on the most-watched television program in American history converted them into limited-purpose public figures with respect to their disqualifications from the show, thereby requiring them to prove falsity and plausibly allege that Viacom's statements were made with actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). *See also Gertz*, 418 U.S. at 345, 351 (observing that limited-purpose public figures are those individuals who have thrust themselves into the limelight voluntarily); *Pendleton v. City of Haverhill*, 156 F.3d 57, 71 (1st Cir. 1998) (plaintiff became a limited-purpose public figure with respect to statements regarding his alleged criminal conduct by giving a media interview about his attempts to secure a job as an educator and thereby voluntarily "inviting the citizenry to judge his bid to become a teacher"). *Cf. Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (allegations that the statements "were known . . . to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity" were too conclusory to allege malice); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (insufficient to allege that speaker "had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false.").

particular factual assertions an allegedly defamatory statement has made. *See Seaton*, 728 F.3d at 597; *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007). The test does not always turn upon the literal words used by the speaker; instead, the question centers upon the factual assertions that the reasonable reader would have understood the statement as making. *Milkovich*, 497 U.S. at 18–21.

Clark and Andrews theorize that FOX possessed a hidden, improper motivation for disqualifying both of them from *American Idol*. Instead of suing FOX, however, their complaint asserts defamation claims against Viacom for repeating FOX's alleged falsehood. Their attempt to impose liability upon Viacom for FOX's purported lie relies upon an argument that each of Viacom's three challenged statements implied a variety of factual assertions, including that plaintiffs were violent felons, that they were criminally charged with battery and assault, and that FOX was in fact motivated to disqualify them because they failed to disclose their criminal histories.

But Viacom's articles do not say what Clark and Andrews think that they do. The May 2012 article presenting Jermaine Jones with an "Award for Past Indiscretions," for example, is about Jones rather than Clark, asserts that Jones was "booted for not disclosing his rap sheet," and says nothing about Clark other than eponymizing the tongue-in-cheek "Award" after him. Whether past conduct amounts to an "indiscretion" is inherently vague and subjective. The article does not reasonably imply anything factual or verifiable about Clark. *See Milkovich*, 497 U.S. at 20.

Plaintiffs' characterization of the remaining two statements similarly misconstrues them. Viacom's articles do *not* state that either Clark or Andrews lied about or concealed their criminal histories; the articles state only that they were "disqualified," "booted," and "sent home" for

certain reasons specified by FOX. The articles, in other words, relate what FOX did, not what plaintiffs did. If Viacom's articles had claimed that "Clark beat his sister and lied about it" or that "Andrews killed an antagonist in a bar fight and covered it up," then this would be a different case. But the factual implication of the statement that FOX "disqualified" or "booted" plaintiffs from the show because of their nondisclosure of criminal charges is simply that FOX cited these reasons when it ejected them from the competition. *See Time, Inc. v. Pape*, 401 U.S. 279, 285 (1971) ("[A] vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody said rather than of what anybody did."). *See also Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 120 (2d Cir. 1977) (noting that media outlets must be permitted to report third parties' public assertions without incurring liability if the representations later appear to have been false); *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1124–27 (N.D. Cal. 1984) (same).

Because the statements in question make much narrower truth-claims than the complaint surmises, the complaint contradicts itself on the question of falsity. The only way that Viacom's statements could be false is if FOX did not *represent* that Clark and Andrews were removed from the show for the reasons in question. But the whole thrust of the complaint is that FOX— as well as its affiliated media entities—did exactly that.

We agree with Clark and Andrews that the district court's analysis was partially incorrect: it came close to making a factual finding that the statements in question were objectively true, despite the fact that it was ruling only upon a Rule 12(b)(6) motion to dismiss. In defamation cases, "the question of truth is normally one for the jury." *Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1233 (6th Cir. 1981); *see also* Restatement (Second) of Torts § 617, cmt. a (1977); *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1137 & n.8 (10th

Cir. 2014) (failing to identify any case in which a motion to dismiss was granted on the grounds of truth). Nor was the district court justified in suggesting that "reputable" media sources are warrants of objective fact. Virality does not guarantee veracity; a falsity does not become true merely through reiteration and general accord. *See Martin*, 777 F.3d at 552 ("The Moving Finger has written and moved on."). No central arbiter can pretend to unerringly detect objective reality, *see Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting), and the district court was incorrect to suggest that favored speakers or public consensus establish truth as a matter of law.

Despite the district court's partial misstep, its threshold reasoning was correct. Observing that a complaint has failed to allege that a statement is false is not the same as ruling that the statement is objectively true. For purposes of Viacom's Rule 12(b)(6) motion, we must remain neutral about whether—as a matter of fact—the statements are objectively true. But what we do know is that the complaint does not allege—as a matter of law—that they are false. The complaint alleges that Viacom reported that FOX said that it removed Clark and Andrews from *American Idol* for certain specific reasons. The complaint also alleges that FOX in fact said that it had disqualified them for those reasons. The complaint, in other words, has alleged that FOX did exactly what Viacom said that it did. Properly construed, plaintiffs' complaint does not fail a test of truth; instead, it fails the law of non-contradiction. Its dismissal was not error.[4]

## IV.

For these reasons, we affirm the judgment of the district court.

---

[4]The parties assume that the dismissal of the remainder of plaintiffs' claims rises and falls with the dismissal of their defamation claims. Absent argument to the contrary, we accept the parties' view of the issues.