**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1783

VIRGINIA CITIZENS DEFENSE LEAGUE; DANIEL L. HAWES, ESQ.; PATRICIA WEBB,

        Plaintiffs – Appellants,

        v.

KATIE COURIC; STEPHANIE SOECHTIG; ATLAS FILMS LLC; STUDIO 3 PARTNERS, LLC, d/b/a EPIX, now known as EPIX ENTERTAINMENT LLC,

        Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge. (3:16-cv-00757-JAG)

Argued: October 30, 2018                    Decided: December 13, 2018

Before GREGORY, Chief Judge, and MOTZ and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:** Joseph Ronald Oliveri, CLARE LOCKE LLP, Alexandria, Virginia, for Appellants. Nathan Ellis Siegel, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellees. **ON BRIEF:** Thomas A. Clare, Elizabeth M. Locke, Megan L. Meier, CLARE LOCKE LLP, Alexandria, Virginia, for Appellants. Kevin T. Baine, Thomas G. Hentoff, Nicholas G. Gamse, Emily A. Rose, WILLIAMS & CONNOLLY LLP, Washington, D.C.; Elizabeth A. McNamara, DAVIS WRIGHT TREMAINE LLP, New

York, New York, for Appellees.

_____

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from the creation and publication of *Under the Gun*, a documentary film on gun violence in America. Aggrieved at their portrayal in the film, appellants — Virginia Citizens Defense League and two of its members, Daniel L. Hawes, and Patricia Webb — filed this action. They alleged defamation by the film's creators, appellees Katie Couric, Stephanie Soechtig, Atlas Films LLC, and Studio 3 Partners, LLC (doing business as Epix Entertainment LLC). The district court dismissed their complaint, and appellants appeal. For the reasons that follow, we affirm.

I.

In 2016, journalist Couric and filmmaker Soechtig released a documentary titled *Under the Gun*. The documentary concerns gun policy in America, and it takes a perspective favoring regulation. Couric narrated the film, interviewed participants, and served as an executive producer. Soechtig directed and edited the film, which Atlas Films produced and Epix distributed.

Although the film advocates for gun control, its creators assertedly sought to present viewpoints from organizations that opposed measures like universal background checks. To that end, a producer employed by Atlas Films contacted the Virginia Citizens Defense League ("VCDL"), a non-profit gun-rights organization, and set up an interview with members of the VCDL. Nine members, including Hawes and Webb, agreed to participate.

The final cut of the film includes portions of Couric's interview with these VCDL members. The segment lasts just over three minutes. At its outset, Couric thanks the

3

VCDL members for participating, noting that they "have a specific point of view on this issue and some of the issues that we're tackling." Couric then poses a series of questions on gun policy. She asks about the appeal of owning a gun, and whether a person should have to pass a background check to purchase a gun. She also asks whether anyone in the group feared that the government would take their guns. These questions prompt detailed responses from the panel members, which are included in the film. Apart from the film-makers' lighting choices, appellants do not object to this portion of the interview.

Instead, this suit centers on a twelve-second clip at the close of the three-minute VCDL interview. In it, Couric asks the following question: "If there are no background checks for gun purchasers, how do you prevent felons or terrorists from purchasing a gun?" Approximately nine seconds of silence follow, during which the VCDL members, including Webb, a gun store owner, and Hawes, an attorney, sit in silence and shift uncomfortably in their seats, averting their eyes. The film cuts to a revolver chamber closing. Couric then says: "The background check is considered the first line of defense, and 90% of Americans agree it's a good thing." Neither the VCDL nor its members are mentioned again in the 105-minute film.

Although the film accurately portrays most of the interview with VCDL members, the twelve-second clip described above did not transpire as depicted. In the unedited footage, Couric's background check question prompted approximately six minutes of responses from the VCDL members. Hawes responded by suggesting that the government cannot, consistent with the Constitution, prevent crimes through prior restraint. Webb commented that background checks are unlikely to prevent motivated criminals from

4

obtaining guns or committing crimes. These responses were followed by approximately three minutes of related discussion between Couric and the panel. Rather than use these responses, the filmmakers spliced in b-roll footage taken prior to the interview in which Couric asked the VCDL interviewees to sit in silence while technicians calibrated the recording equipment.

Shortly after the film's showing at various film festivals, the VCDL released unedited audio of the interview. In the public backlash that followed, Couric issued a statement admitting that the edited version of the film did "not accurately represent [the VCDL members'] response" and that the segment was "misleading." Believing the misleading segment to be defamatory, the VCDL and two of its featured members, Hawes and Webb, brought this action. The district court dismissed their complaint for failure to state a claim, reasoning that the film was neither false nor defamatory and that, as to claims brought by the VCDL, the film was not "of and concerning" the organization. This appeal followed.

II.

We review de novo a district court's grant of a motion to dismiss. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 423 (4th Cir. 2018). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "has

5

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

To state a claim for defamation under Virginia law, a plaintiff must plead three elements: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (quoting *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013)). The first and third elements are not at issue here. The parties dispute only whether the statement — in this case, footage edited to convey silence — is actionable. To be "actionable," a statement must be "both false and defamatory." *Id*. (quoting *Tharpe*, 737 S.E.2d at 892). To recover, the VCDL must also establish that the alleged defamatory statement was "of and concerning" the organization. *Id*. at 598; *Dean v. Dearing*, 561 S.E.2d 686, 688 (Va. 2002).

"Defamatory words are those 'tend[ing] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Schaecher*, 772 S.E.2d at 594 (quoting Restatement (Second) of Torts § 559) (alteration in original). The Supreme Court of Virginia has held that actionable defamatory language is that which "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Id*. (internal quotation marks omitted).[1] In contrast,

---

[1] Appellants' attempt to modify this standard by relying on the Restatement's suggestion that it suffices for a statement to injure one's reputation in the mind of "a substantial and respectable minority" of the community, *see* Restatement (Second) of Torts

6

"language that is insulting, offensive, or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole,'" is not actionable. *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137 (Va. 1998).

Applying Virginia law, a court "must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Schaecher*, 772 S.E.2d at 595; *see also Pendleton v. Newsome*, 772 S.E.2d 759, 763 (Va. 2015) (describing the defamation inquiry as "an essential gatekeeping function of the court" (quoting *Webb v. Virginian-Pilot Media Cos.*, 752 S.E.2d 808, 811 (Va. 2014))). This "reasonable capability" test recognizes that defamatory meaning is often implied.

Virginia law requires that when "determining whether the words and statements complained of . . . are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Webb*, 752 S.E.2d at 811. "Although a defamatory statement may be inferred, a court may not 'extend the meaning of the words used beyond their ordinary and common acceptance.'" *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 450 (Va. 2006) (quoting *Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997)); *see also*

---

§ 559 cmt. e, rather than "in the common estimation of mankind," *see Schaecher*, 772 S.E.2d at 594. This argument fails. Virginia courts have never articulated such an approach or applied this portion of the Restatement. Moreover, the Restatement comment does not alter the central requirement that a given statement must be capable of *defamatory* meaning, a high bar that appellants cannot clear regardless of how we frame the relevant population.

7

*Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 591–92 (Va. 1954) ("[A]llegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used.").

III.

A.

Appellants first contend that the film is defamatory per se.[2] As relevant here, a statement — in this case, a film — is defamatory per se when it can reasonably be understood to suggest that a person is unfit in his or her trade. *Tronfeld*, 636 S.E.2d at 450 (identifying statements "which prejudice [a] person in his or her profession or trade" as "actionable per se"). There must be a "nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff." *Fleming*, 275 S.E.2d at 636.

---

[2] "Unlike most states, Virginia makes no distinction between actions for libel and those for slander." *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981). Accordingly, its courts have construed common law slander as defamation per se, which is actionable without proof of damages, and treated all other defamation claims as actionable subject to proof of damages. *Id.*; *see also Stamathis v. Flying J, Inc.*, 389 F.3d 429, 440 (4th Cir. 2004) ("The critical distinction between defamation per se and other actions for defamation is that a person so defamed is presumed to have suffered general damages, and any absence of actual injury is considered only in diminution of damages."). Notwithstanding this distinction, both defamation per se and general defamation claims may "be made by inference, implication or insinuation," as appellants allege here. *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003) (internal quotation marks omitted).

8

Turning first to Hawes, appellants argue that because Hawes "is an attorney whose practice focuses on firearms and self-defense," the edited footage "is reasonably capable of being understood" as suggesting "that Hawes lacks the required competencies and abilities for his profession, including oral advocacy skills." But unlike the cases on which appellants rely,[3] the questions posed to Hawes had nothing to do with his legal practice or expertise. Reading appellants' suggested meaning into the film would stretch the footage well "beyond its ordinary and common" meaning. *Schaecher*, 772 S.E.2d at 595 (quoting *Webb*, 752 S.E.2d at 811). Although we must construe inferences and innuendo in appellants' favor, we may not "introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." *Id.* (quoting *Webb*, 752 S.E.2d at 811). Accepting Hawes' defamation per se claim would require us to extend mere silence into professional ineptitude. Thus, his claim fails.

Similarly, the film is not reasonably capable of suggesting that Webb is unfit to own a gun store. Arguing otherwise, Webb contends that her "business requires her to be knowledgeable . . . about the right of individuals to purchase firearms," and that the edited footage suggests that "she lacks knowledge regarding integral aspects of her business."

---

[3] *See Tronfeld*, 636 S.E.2d at 450 (statement that an attorney "just takes people's money"); *Carwile*, 82 S.E.2d at 592 (statements charging "an attorney at law with unethical or unprofessional conduct and which tend to injure or disgrace him in his profession"); *Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 747 (E.D. Va. 2009) (statement "questioning Plaintiff's ethical conduct as a practicing attorney, accusing him of the criminal act of extortion, and stating that Plaintiff had been discharged from his employment with a law firm as a result of such conduct"); *cf. Perk*, 485 S.E.2d at 143–44 (statement involving an attorney's work as a debt collector).

But of course, no part of Webb's job as a gun store owner requires her to have nuanced views on gun *policy*. Had the film suggested that Webb did not know, for instance, whether a gun store owner must perform a background check, this might be a different case. But as the district court explained, "[n]ot having an answer to a specific question about effective alternatives to background checks does not imply anything about fitness to own a gun store and to sell guns."

We also agree with the district court that the edited footage cannot reasonably be construed as implying, as appellants argue, that the VCDL is unfit as a "pro-Second Amendment advocacy organization." At most, the film suggests that a handful of VCDL members, none of whom are identified as leaders within the organization, could not immediately answer a difficult gun policy question.

Resisting this conclusion, the VCDL argues that the footage implies that it "failed to deliver on its mission, thereby casting aspersion on the VCDL's prestige and standing in the field of Second Amendment advocacy." Once again, this argument requires a court to extend the film's meaning well beyond what the clip shows. *Schaecher*, 772 S.E.2d at 595. Even for an organization steeped in gun policy, the essential message that VCDL members failed to respond instantly to a complex question is simply not defamatory. For the same reasons, the film cannot reasonably be understood as defaming Webb and Hawes in their respective capacities as executive members of the VCDL.

B.

Having resolved appellants' per se claim, we consider their contention that the film implied other actionable defamatory meanings.

10

Appellants maintain that the edited footage suggests that the VCDL and its members have no basis for opposing background checks or are otherwise uninformed in their areas of expertise. This claim fails because it divorces the twelve-second clip from the film as a whole. *Schaecher*, 772 S.E.2d at 595 (instructing that statements must be viewed "in context"). The disputed segment comes on the heels of several other questions concerning background checks, and the panelists' answers to all of those questions are included in the film.

To be sure, the film gives the impression that Couric's final question stumped the panelists. But at worst, the plain, ordinary meaning of this edit conveys that these particular members of the VCDL, after answering a series of related questions, did not have a ready-made answer to a nuanced policy question. Even with the benefit of every inference, the edited footage is not reasonably capable of suggesting that the VCDL and its members are, as they contend on appeal, "ignorant and incompetent on the subject to which they have dedicated their organizational mission."

In arguing to the contrary, appellants heavily rely on the *Schaecher* court's description of defamatory language as including that which is calculated to render a person "ridiculous." *Schaecher*, 772 S.E.2d at 594. In doing so, appellants ask us to focus on this single word, at the expense of those surrounding it, eschewing ordinary interpretive principles. *Cf. Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (relying "on the principle of noscitur a sociis" to "cabin the contextual meaning of" a single term in a statutory list). Reading the term "ridiculous" in context with the descriptive words preceding it — i.e., language that "tends to hold [one] up to scorn, ridicule, or contempt,

11

or which is calculated to render [one] infamous, odious, or ridiculous," *Schaecher*, 772 S.E.2d at 594 — clarifies what Virginia law makes abundantly clear elsewhere: simple insults are not "actionable" in Virginia. *Yeagle*, 497 S.E.2d at 137–38.

C.

In a last-ditch effort to rescue the complaint, appellants cite news reports covering the controversy to suggest that "viewers of *Under the Gun* actually understood the exchange" as negatively portraying the VCDL and its members. Assuming this is true, it does not answer the question before us. Regardless of how certain media outlets covered the short-lived frenzy surrounding this incident, the Supreme Court of Virginia has consistently stressed that it is the province of courts to perform the "gatekeeping" role of distinguishing defamatory speech from mere insults. *Schaecher*, 772 S.E.2d at 595; *Webb*, 752 S.E.2d at 811.

Courts should not — indeed, cannot — abdicate this role in hopes that a member of the press or public will answer the question for them. Instead, Virginia law requires courts to exercise independent legal judgment as to whether challenged statements are susceptible to the defamatory meaning alleged. *See, e.g.*, *Perk*, 485 S.E.2d at 144 (concluding that challenged statements were not "sufficiently defamatory on their face to permit a fact finder to decide whether in fact the statements were actually defamatory").

If any doubt remained on this point, the Supreme Court of Virginia's recent decision in *Webb v. Virginian-Pilot* closes the door. There, the court considered an appeal from a jury verdict that rested on testimony from several witnesses suggesting that they inferred defamatory meaning from the challenged news article. *Webb*, 752 S.E.2d at 812.

12

Notwithstanding this evidence, the court reversed, holding as a matter of law that the article was not reasonably capable of the defamatory meaning ascribed. *Id.* Applying these principles, we conclude that the district court properly performed its independent gatekeeping role in this case. And on the merits of that question, the district court reached the correct result.[4]

IV.

The crux of appellants' defamation claims is that the edited interview "manufacture[d] a false exchange . . . that made [appellants] look ridiculous, incompetent, and ignorant about firearm ownership and sales, including the policies surrounding background checks." Although we agree that the filmmakers' editing choices were questionable, the edited footage simply does not rise to the level of defamation under Virginia law. Accordingly, the judgment of the district court is

*AFFIRMED.*

---

[4] Because we conclude that the edited footage is not reasonably capable of defamatory meaning, we need not reach the district court's holdings on the falsity and of-and-concerning elements of Virginia's defamation test. Similarly, because the edited video footage does not convey a defamatory meaning, we need not decide whether silence under Virginia law can satisfy the statement requirement of a defamation cause of action.