**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1368**

SVETLANA LOKHOVA,

        Plaintiff - Appellant,

    v.

STEFAN A. HALPER; DOW JONES & COMPANY, INCORPORATED, d/b/a
The Wall Street Journal; THE NEW YORK TIMES COMPANY; WP COMPANY
LLC, d/b/a The Washington Post; NBCUNIVERSAL MEDIA, LLC, d/b/a
MSNBC,

        Defendants - Appellees,

------------------------------

29 MEDIA ORGANIZATIONS; REPORTERS COMMITTEE FOR FREEDOM
OF THE PRESS,

        Amici Supporting Appellee.

**No. 20-1437**

SVETLANA LOKHOVA,

        Plaintiff - Appellee,

    v.

STEFAN A. HALPER,

        Defendant - Appellant,

and

DOW JONES & COMPANY, INCORPORATED, d/b/a The Wall Street Journal; THE NEW YORK TIMES COMPANY; WP COMPANY LLC, d/b/a The Washington Post; NBCUNIVERSAL MEDIA, LLC, d/b/a MSNBC,

Defendants,

------------------------------

29 MEDIA ORGANIZATIONS; REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS,

Amici Supporting Appellee.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:19-cv-00632-LMB-JFA)

Argued: March 10, 2021                    Decided: April 15, 2021

Before WYNN, THACKER, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Wynn joined. Judged Quattlebaum wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Steven Scott Biss, LAW OFFICE OF STEVEN S. BISS, Charlottesville, Virginia, for Appellant/Cross-Appellee. Seth Daniel Berlin, BALLARD SPAHR, LLP, Washington, D.C.; Laura Rose Handman, DAVIS WRIGHT TREMAINE, LLP, Washington, D.C.; Terrance Gilroy Reed, LANKFORD & REED, PLLC, Alexandria, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Robert D. Luskin, PAUL HASTINGS LLP, Washington, D.C.; Robert K. Moir, LANKFORD & REED, PLLC, Alexandria, Virginia, for Appellee/Cross-Appellant Stefan A. Halper. Matthew E. Kelley, BALLARD SPAHR LLP, Washington, D.C., for Appellee/Cross-Appellant Dow Jones & Company, Inc. and The New York Times Company. Dana R. Green, Legal Department, THE NEW YORK TIMES COMPANY, New York, New York, for Appellee/Cross-Appellant The New York Times Company. Eric J. Feder, Patrick J. Curran Jr., DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellees/Cross-Appellants WP

Company, LLC and NBCUniversal Media, LLC. Bruce D. Brown, Katie Townsend, Caitlin Vogus, Lyndsey Wajert, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amici Curiae.

THACKER, Circuit Judge:

Svetlana Lokhova ("Appellant") sued Stefan Halper ("Appellee Halper") and various news organizations ("Media Appellees"), alleging defamation, civil conspiracy, and tortious interference with contract. The district court dismissed all of Appellant's claims, holding the majority of Appellant's defamation claims were barred by the one year statute of limitations. The district court held the remaining defamation claims failed because the statements were not defamatory as a matter of law and because Appellant failed to plead sufficient facts to support vicarious liability. Because Appellant's defamation claims failed, the district court dismissed her civil conspiracy and tortious interference with contract claims, as each hinged on the validity of the defamation claims. The district court also denied without prejudice Appellee Halper's motion for sanctions against Appellant and her attorney, Steven S. Biss, for their alleged abusive litigation conduct.

Appellant appeals the dismissal of her tort claims and Appellee Halper cross appeals the denial of his motion for sanctions. For the reasons set forth herein, we affirm the district court on all issues.

I.

Appellant is a Russian born academic who alleges that Appellees defamed her by falsely stating that she was a Russian spy involved in the alleged collusion between Russia and the campaign of former President Donald Trump. The recurring theme throughout Appellant's amended complaint is that Appellees' publications defamed Appellant by falsely stating she had an affair with General Michael Flynn on the orders of Russian intelligence, thereby compromising him. And, specifically, Appellant alleges that

4

Appellee Halper is a veteran political operative who was the source of the allegedly defamatory statements published by the Media Appellees.

The parties agree that the statute of limitations for defamation actions is one year. This lawsuit was initially filed on May 23, 2019. Thus, statements published prior to May 23, 2018 are time barred. Nonetheless, the amended complaint alleges Appellees are liable for various statements published both before and after May 23, 2018.

A.

Statements Published Prior to May 23, 2018

Appellant alleges that statements published prior to May 23, 2018, can serve as a basis for liability despite the one year statute of limitations because the statements were republished within the statute of limitations by hyperlink, in the case of one New York Times article, and by third party tweets for the rest of the publications. The district court rejected this argument. For the reasons detailed below, we agree with the district court. Therefore, the content of the allegedly defamatory statements published prior to May 23, 2018, need not be discussed in detail. Suffice it to say Appellant generally relies on statements published prior to May 23, 2018, to allege Appellees manufactured a "web of lies" falsely accusing her of being a "Russian spy" who "had an affair with General Flynn on the orders of Russian intelligence" and in doing so, "compromised" him. J.A. 19–20.[1]

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

B.

Statements Published After May 23, 2018

The amended complaint identifies two allegedly defamatory publications occurring after May 23, 2018.  The first is a Washington Post article published June 5, 2018 (the "Post Article").  The second is a series of tweets issued by Malcolm Nance ("Nance").

1.

The Post Article

The amended complaint asserts that the Post Article is defamatory to Appellant because it includes the following statement:

> During a dinner [General] Flynn attended, [Appellee] Halper and [Richard] Dearlove[2] were disconcerted by the attention the then-DIA[3] chief showed to a Russian-born graduate student who regularly attended the seminars, according to people familiar with the episode.

J.A. 75.   The amended complaint alleges two defamatory falsehoods in the quoted statement: (1) that Appellee "Halper 'attended' . . . the February 2014 dinner"; and (2) that "[Appellee] Halper and Dearlove were disconcerted by the attention the then-DIA chief showed to a Russian-born graduate student."  *Id.*  The district court held the Post Article not defamatory as a matter of law, and we agree.

---

[2] The amended complaint describes Dearlove as a "political operative[] at Cambridge University" and "retired head of British intelligence."  J.A. 18.

[3] Defense Intelligence Agency

6

2.

Tweets Authored by Nance

First, of note, Appellant failed to serve Nance as a defendant. Instead, Appellant alleges that Appellee NBCUniversal/MSNBC is liable for Nance's tweets pursuant to the respondeat superior doctrine. The amended complaint describes Nance as the chief terrorism analyst for MSNBC, but it does not allege that Nance is employed by MSNBC. The complaint asserts, "Nance maintains and operates an official Twitter account on which he conducts the business of 'NBC/MSNBC.'" J.A. 76. "NBC/MSNBC" appears in Nance's Twitter bio at the end of a list of other credentials that are personal to Nance. *Id.* The complaint further asserts, "At all times relevant to this action, NBCUniversal/MSNBC acted by and though [sic] its authorized agents, including Malco[l]m W. Nance." *Id.* at 75.

On July 16, 2018, Nance tweeted, "The technical name for sexy women Agents is a 'Svetlana.'" J.A. 79. Then, on July 19, 2018, another Twitter user responded to one of Nance's tweets which described Appellant as a "[h]oneypot."[4] *Id.* at 80. The user asked: "Flynn and Lokhova?" *Id.* To which Nance responded, "Very likely." *Id.* The amended complaint characterizes this response by Nance as "stat[ing] that [Appellant] was a 'Honeypot.'" *Id.* at 79.

The district court held the amended complaint failed to adequately plead that NBCUniversal may be held vicariously liable for Nance's tweets. Again, we agree.

---

[4] Appellant asserts, "A 'honeypot' is a spy (typically attractive and female) who uses sex to trap and blackmail a target." Appellant's Br. 14 n.14.

C.

Appellee Halper's Motion for Sanctions

In addition to his motion to dismiss, Appellee Halper filed a motion to sanction Appellant and attorney Biss. The motion for sanctions argued that Appellant and attorney Biss used this litigation "to make, publicize and disseminate vulgar and degrading accusations" against Appellee Halper. J.A. 330–31. The amended complaint calls Appellee Halper a "ratf***er" and the Media Appellees "stooges." *Id.* at 17, 27. The motion for sanctions further asserted that Appellant's claims are "meritless" and "based on obviously untimely allegedly defamatory statements." *Id.* at 331.

Focusing on attorney Biss, the district court found, "The record is clear that Biss filed an excessively long complaint and amended complaint on [Appellant]'s behalf directing unprofessional ad hominem attacks at Halper and others." J.A. 331. However, the district court declined to impose sanctions and dismissed the motion for sanctions without prejudice. In so doing, the district court warned, "[S]hould Biss file further inappropriate pleadings or pursue frivolous post-judgment litigation . . . sanctions might well be justified." *Id.* at 332.

II.

We review de novo the district court's grant of a Rule 12(b)(6) motion to dismiss. *See Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Although for the purposes of a motion to

dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

We review a district court's sanctions decisions for abuse of discretion. *See Six v. Generations Fed. Credit Union*, 891 F.3d 508, 518–19 (4th Cir. 2018).

### III.

Appellant contends the district court erred by dismissing her defamation, civil conspiracy, and tortious interference with contract claims.

### A.

### Statements Published Prior to May 23, 2018

As noted, the parties do not dispute that the statute of limitations governing the defamation claims is one year. *Cf* Va. Code Ann. § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues."). Thus, Appellant does not argue that original publications occurring more than one year prior to the filing of this lawsuit independently support a defamation claim. Instead, Appellant argues that each time an allegedly defamatory publication was hyperlinked or tweeted, the statute of limitations began anew.

### 1.

### Single Publication Rule

In the absence of a Virginia Supreme Court ruling, we have determined that Virginia would follow the "great majority of states [that] now follow the single publication rule." *Morrissey v. William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984). The single

9

publication rule "permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons." *Katz v. Odin, Feldman & Pitlleman, P.C.*, 332 F. Supp. 2d 909, 918 (E.D. Va. 2004). Pursuant to the single publication rule, "subsequent distribution of a defamatory statement may continue to increase plaintiff's compensable damages," but the subsequent distribution "does not create independent actions or start the statute of limitations running anew." *Id.* (citing *Zuck v. Interstate Publ'g Corp.*, 317 F.2d 727, 729–30 (2d Cir. 1963)). "Jurisdictions that have adopted the single publication rule are nearly unanimous in applying it to internet publications." *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 879 (W.D. Va. 2016) (internal quotation marks omitted). The single publication rule aims to "avoid the overwhelming multiplicity of lawsuits that could result from defamatory statements contained in mass publications such as newspapers and magazines." *Armstrong v. Bank of Am.*, 61 Va. Cir. 131, 2003 WL 1960685, at *2 (2003). This underlying rationale has led other courts to observe "the Internet's greater reach comes with an 'even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants.'" *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 616 (7th Cir. 2013) (quoting *Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002)).

2.

Republication Doctrine

a.

Hyperlink

Appellant argues that the republication doctrine saves her claims from the statute of limitations bar. Appellant argues that hyperlinks constitute republication because pursuant to the republication doctrine, "where the same defamer communicates a defamatory statement on several different occasions to the same or different audience, each of those statements constitutes a separate publication" that resets the statute of limitations. *Doe v. Roe*, 295 F. Supp. 3d 664, 670–71 (E.D. Va. 2018) (citing Restatement (Second) of Torts § 577A cmt. a.1 (1977)). However, as the *Eramo* court observed, "It is less clear how the republication exception . . . applies in the context of electronic media" than the "nearly unanimous" application of the single publication rule in the same context. 209 F. Supp. 3d at 879.

Indeed, as the district court observed, "persuasive case law suggests, although 'creating hypertext links to previously published statements' may technically direct audiences' attention to the prior dissemination of those statements, such links do not constitute republication." J.A. 310 (quoting *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 505–07 (6th Cir. 2015)). As the Third Circuit observed:

> Several courts specifically have considered whether linking to previously published material is republication. To date, they all hold that it is not based on a determination that a link is akin to the release of an additional copy of the same edition of a

11

publication because it does not alter the substance of the original publication.

*In re Phila. Newspapers*, 690 F.3d 161, 174 (3rd Cir. 2012). The Third Circuit concurred, reasoning, "[U]nder traditional principles of republications, a mere reference to an article . . . does not republish the material." *Id.* at 175. It further explained the "traditional principles are as applicable to Internet publication as traditional publication, if not more so" because "[i]f each link or technical change were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated." *Id.* Indeed, we see no principled reason for holding a hyperlink distinct from a traditional reference, such as a footnote, for purposes of republication. To the extent Appellant argues the hyperlink's added accessibility and convenience presents a significance difference, we disagree because the Internet has inherently increased the accessibility of *all* references.

Subsequent to *In re Philadelphia Newspapers*, courts have consistently agreed that "[m]erely linking to an article should not amount to republication, . . . whereas making changes to material already published on a website, or adding substantive material to allegedly defamatory content on a website, could constitute republication, depending on the facts of the case." 4 E-Commerce and Internet Law § 37.08 (2020) (citing *Slozer v. Slattery*, No. 2566 EDA 2014, 2015 WL 7282971, at *6–7 (Pa. Sup. Ct. Nov. 18, 2015) ("We agree with the reasoning of the Third Circuit [in *Philadelphia Newspapers*] and conclude it accurately reflects Pennsylvania law regarding the doctrines of single publication and republication in defamation actions as they apply to internet communications.")). We likewise agree. The public policy supporting the single

12

publication rule and the traditional principles of republication dictate that a mere hyperlink, without more, cannot constitute republication.

But Appellant argues that here, whether the hyperlink in question included additional content that would constitute republication is a factual question that should survive a motion to dismiss. In attempt to support this position, Appellant relies heavily on *Stephen G. Perlman, Rearden LLC v. Vox Media, Inc.*, No. 10046, 2015 WL 5724838, at *19 (Del. Ch. Sept. 30, 2015) (denying a motion to dismiss a claim that alleged a defamatory statement was republished by a hyperlink reference because republication generally presents a question of fact). Appellant's reliance on *Perlman* is misplaced for two reasons. First, the Superior Court of Delaware subsequently granted summary judgment on the issue, holding that a hyperlink directing readers to a previous article on the *same* website does not direct the previous article to a new audience, it merely reshuffles the existing audience. *See Perlman v. Vox Media, Inc.*, No. N195C-07-235, 2020 WL 3474143, at *8 (Del. Super. Ct. June 24, 2020). That is precisely the case here. The original New York Times article that Appellant alleges was defamatory was hyperlinked in a later New York Times article. Thus, the hyperlink served as a reference for the New York Times' existing audience and did not direct the old article to a new audience. Second, the plaintiff in *Perlman* alleged that the text that contained the hyperlink was itself defamatory. Appellant makes no such allegation here. Nor could she credibly do so, given that the hyperlink is contained in the underlined portion of the following sentence: "Mr. Halper's contacts have prompted Republicans and the president to incorrectly <u>accuse the F.B.I.</u> of spying on the campaign." J.A. 311. Clearly the text in which the hyperlink was

13

contained bears no relationship to Appellant. Thus, Appellant's attempt to rely on a factual dispute regarding whether the hyperlink constitutes republication fails.

b.

Third Party Tweets

Appellant further asserts that republication occurs each time a third party tweets an article, thus re-setting the statute of limitations and exposing the original publisher to liability. Notably, Appellant cites no cases that are directly on point. Instead, Appellant relies almost exclusively on *Weaver v. Beneficial Finance Co.*, a Virginia Supreme Court decision from 1957. *See* 98 S.E.2d 687 (Va. 1957). In *Weaver*, the court analyzed whether sending an allegedly defamatory letter to the plaintiff's employer constituted republication because any claim based on the original publication of the letter was time barred. *Id.* at 689–90. The *Weaver* court observed, "It is well settled that the author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication." *Id.* at 690. The court qualified its observation by noting "the original author is not responsible if the republication or repetition is not the natural and probable consequence of his act, but is the independent and unauthorized act of a third party." *Id.* Here, Appellant argues that each third party tweet constitutes republication pursuant to *Weaver* because *Weaver* further observed that "where the words declared on are slanderous per se their repetition by others is the natural and probable result of the original slander." *Id.*

14

Ignoring for a moment that *Weaver* was decided over 60 years ago, well before the ubiquity of the Internet, this issue can be resolved pursuant to the terms of *Weaver* itself because there the court recognized a distinction when applying republication rules "to newspapers and magazines" as opposed to individuals. *Weaver*, 98 S.E.2d at 691 (citing *Hartmann v. Time*, 166 F.2d 127 (3rd Cir. 1947)). The citation to *Hartmann* is particularly significant because in *Hartmann*, the Third Circuit observed that with respect to newspapers, the "single publication rule is the preferable one" because public policy and the freedom of the press command that "newspapers and magazines which are published on a nationwide basis[] should not be subjected to the harassment of repeated law suits." 166 F.2d at 134. This observation is consistent with the *Armstrong* court's pronouncement that the "rationale underlying the single publication rule" aims to "avoid the overwhelming multiplicity of lawsuits that could result from defamatory statements contained in mass publications such as newspapers and magazines." 2003 WL 1960685, at *2. If each third party tweet containing the article were to constitute a republication, the multiplicity of lawsuits assuredly would be beyond overwhelming.

Moreover, *Weaver* quoted a secondary source stating, "[T]he publisher of a newspaper or magazine has been held not responsible for the acts of third persons who, after the original publication, sell copies of the newspaper or magazine to others." 98 S.E.2d at 690 (quoting 53 C.J.S., Libel and Slander, § 85, p. 137). Thus, we conclude *Weaver* does not require holding third party tweets constitute republication. This conclusion is bolstered by the weight of persuasive authority analyzing the precise issue at hand and reaching the same conclusion. *See Clark*, 617 F. App'x at 505 ("Generally, the

15

courts . . . have concluded that statements posted to a generally accessible website are not republished by conduct such as . . . a third party's posting the statement elsewhere on the internet . . . ." (citing *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007))).

B.

Statements Published After May 23, 2018

We now turn to the two allegedly defamatory publications that are not time barred. The first is the Post Article and the second is a series of tweets authored by Nance which Appellant claims are attributable to Appellee NBCUniversal.[5]  We conclude that neither claim can survive a motion to dismiss.

Pursuant to Virginia law, a plaintiff alleging defamation "must plead three elements: '(1) publication of (2) an actionable statement with (3) the requisite intent.'" *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018) (quoting *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015)).  "To be actionable, a statement must be both false and defamatory." *Id.* (internal quotation marks omitted).  "At the 12(b)(6) stage in a defamation case, a court must accept as false any statement which the Complaint alleges to be false[,]"

---

[5] Appellant's briefing also contains vague arguments regarding a statement made to Appellant by an MSNBC producer.  The briefing contends the statement "is a direct republication of an earlier false and defamatory statement published to [the MSNBC producer] by her MSNBC colleague."  Appellant's Br. 44.  The district court dismissed the same argument in a footnote because "[t]he complaint does not allege that NBCUniversal is liable for this alleged statement through a theory of respondeat superior, nor does it directly claim that the colleague was an NBCUniversal employee or was acting within the scope of employment when making the statement."  J.A. 321 n.21.  We agree with this assessment of the amended complaint, as well as the district court's conclusion that the amended complaint, therefore, fails to "adequately link this alleged statement to any of the defendants." *Id.*

16

thus, "the key actionability question in deciding a motion to dismiss is whether the statements referenced in the Complaint are defamatory." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 659 (E.D. Va. 2015) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (explaining that, on a motion to dismiss in a Virginia libel action, a court must "credit the plaintiff's allegation of the factual falsity of a statement")).

"Defamatory words are those tending so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Schaecher*, 772 S.E.2d at 594 (internal quotation marks omitted). The Virginia Supreme Court characterizes language that has the required "defamatory sting" as language that "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Id.* (internal quotation marks omitted). Additionally, it must be "apparent on the face of the pleading that the alleged defamatory statements are of and concerning the plaintiff." *Id.* at 598 (internal quotation marks omitted). And while a plaintiff may state a defamation claim based on innuendo arising out of statements that are otherwise non-actionable on their face, those statements must be "reasonably read to impart the false innuendo." *Chapin*, 993 F.2d at 1093.

1.

The Post Article

The amended complaint alleges two defamatory false statements in the Post Article: (1) that "[Appellee] Halper 'attended' . . . the February 2014 dinner"; and (2) that

17

"[Appellee] Halper and Dearlove were disconcerted by the attention the then-DIA chief showed to a Russian-born graduate student." J.A. 75. We can quickly dispose of any claim regarding the first statement because it is plainly "of and concerning" Appellee Halper alone and says nothing about Appellant, let alone anything defamatory. *Schaecher*, 772 S.E.2d at 598. Moreover, the dinner in question would have to be particularly extraordinary for merely noting one's attendance to carry the required "defamatory sting." *Id.* at 594.

Regarding the second statement, we conclude that it cannot be reasonably read to defame Appellant, either directly or through implication or innuendo. The statement expresses that Appellee Halper and Dearlove "were disconcerted by the attention" General Flynn showed to an unnamed graduate student. Even if we infer the unnamed graduated student is Appellant, it says nothing of her behavior toward General Flynn -- it only addresses his behavior toward her. This is especially relevant given the article included a disclaimer reporting, "[T]he student and a Defense Department official traveling with Flynn have denied that anything inappropriate occurred." J.A. 75.

Furthermore, like the district court, we find *Webb v. Virginia-Pilot Media Co.* particularly relevant. *See* 752 S.E.2d 808 (Va. 2014). There, the Supreme Court of Virginia analyzed whether a statement in an article could be reasonably inferred to insinuate that an assistant principal "had engaged in unethical conduct by obtaining preferential treatment for his son." *Id.* at 810. The court concluded that although the article insinuated that the plaintiff's son "may have benefited from special treatment," it did "not state or suggest that [the plaintiff] undertook any affirmative action to arrange or endorse

18

the school system's disciplinary response to the incidents." *Id.* at 811. Thus, the court concluded that the article in question failed to "create a reasonable implication that [the plaintiff] solicited or procured the insinuated special treatment." *Id.* Further, the court credited the article's disclaimer of such implication. *See id.* at 812.

Here, the Post Article similarly failed to "create a reasonable implication that [Appellant] solicited or procured the insinuated special" attention from General Flynn because it focused on General Flynn's conduct alone. *Webb*, 752 S.E.2d at 811. Like the article in *Webb*, the Post Article did "not state or suggest that [Appellant] undertook any affirmative action to arrange or endorse" the attention from General Flynn. *Id.* And, the Post Article disclaimed that very implication, as did the article in *Webb*. Thus, we conclude that the Post Article did not defame Appellant.

2.

Tweets Authored by Nance

Finally, Appellant claims NBCUniversal is vicariously liable for the tweets authored by Nance. However, even assuming arguendo that the tweets are defamatory, Appellant's claim fails because she has not adequately pled facts that support holding NBCUniversal liable pursuant to the respondeat superior doctrine. "[U]nder the traditional doctrine of respondeat superior, an employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment." *Parker v. Carilion Clinic*, 819 S.E.2d 809, 819 (Va. 2018) (internal quotation marks omitted).

19

If a complaint plausibly alleges that an employer-employee relationship exists, it creates a rebuttable presumption of vicarious liability. *See Parker*, 819 S.E.2d at 822. However, mere "conclusory language in the complaint does not . . . establish vicarious liability." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 146 (4th Cir. 2018). Here, the amended compliant does not specifically allege that Nance was an NBCUniversal employee. Instead, the amended complaint appears to rely on agency theories of authorization or apparent authorization as it asserts Nance "holds himself as an agent of MSNBC and regularly appears on television to espouse the views and agendas of MSNBC." J.A. 26.

According to the Restatement (Second) of Agency, "one who appears to have authority to make statements for the employer gives to his statements the weight of the employer's reputation. For this reason, the liability of the master may be based upon apparent authority." § 247c (1958). Arguing pursuant to this framework, Appellant claims the amended complaint plausibly alleges that "Nance was acting as an agent of MSNBC within the scope of his actual or apparent authority." Appellant's Br. 46. This argument is flawed.

To begin with, Appellant's briefing entirely ignores the district court's observation that "although Virginia courts have applied the theory of apparent agency to contract cases, it appears that the theory 'has never been used in Virginia to impose vicarious liability on an employer for the negligent acts of an independent contractor.'" J.A. 326–27 (quoting *Parrish v. Am. Airlines, Inc.,* 97 Va. Cir. 271, at *4 (2017)). However, even if we assume

20

that apparent agency can support a vicarious liability claim in Virginia, the allegations in the amended complaint fail to satisfy the elements of apparent agency.

The sole factual allegation supporting Appellant's conclusory statement that Nance "conducts the business of 'NBC/MSNBC'" on his Twitter account is that "NBC/MSNBC" appears in Nance's Twitter bio. J.A. 76. But viewed in context, this is not enough to give rise to apparent agency. "NBC/MSNBC" appears at the end of a long list of credentials that are personal to Nance.[6] Moreover, Nance's username, profile picture, and banner contain no mention of NBC, and the profile contains a link to a website that is operated by an organization for which Nance serves as the executive director. Finally, one of the allegedly defamatory tweets appears in a thread of tweets that begins with Nance promoting his personal book. Thus, the only reasonable conclusion is that Nance was operating his Twitter account in his personal capacity and not with the actual or apparent authority of NBCUniversal. "[C]onclusory language in the complaint" does not alter this conclusion and cannot "establish vicarious liability." *Garnett*, 892 F.3d at 146. Therefore, we affirm the district court's dismissal of Appellant's defamation claims based on tweets authored by Nance.

---

[6] The full bio states: "US Intelligence +36 yrs. Expert Terrorist Strategy, Tactics, Ideology. Torture, Russian Cyber! NYT Bestselling Author, Navy Senior Chief/Jedi Master, NBC/MSNBC." J.A. 76.

C.

Civil Conspiracy and Tortious Interference with Contract Claims

1.

Civil Conspiracy

Because Appellant's defamation claims fail, so too does her civil conspiracy claim. A civil conspiracy claim "generally requires proof that the underlying tort was committed." *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007). Further, the statute of limitations "for civil conspiracy is based on the statute of limitations for the underlying act." *Hurst v. State Farm Mut. Auto. Ins. Co.*, No. 7:05-cv-776776, 2007 WL 951692, at *5 (W.D. Va. Mar. 23, 2007). Thus, Appellant's time barred and inadequately pled defamation claims cannot support a claim of civil conspiracy. Nor can the civil conspiracy claim be supported by the tortious interference with contract claim as discussed below.

2.

Tortious Interference with Contract

"In Virginia, the elements of a claim for tortious interference with contractual relations" include "knowledge of the relationship or expectancy on the part of the interferor" and "intentional interference inducing or causing a breach or termination of the relationship or expectancy." *Schaecher*, 772 S.E.2d at 602.

Here, the allegations of Appellee Halper's knowledge of Appellant's business expectancies are wholly conclusory. When pressed at oral argument for non-conclusory factual allegations in the amended complaint that would establish Appellee Halper's knowledge of Appellant's business expectancies, Appellant's counsel argued that

knowledge was adequately pled because Appellee "Halper was aware of [Appellant's] participation" in various security seminars and the Cambridge Security Initiative ("CSI"). Oral Argument at 12:20–28, *Lohkova v. Halper*, No. 20-1368 (4th Cir. Mar. 10. 2021), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (citing, *e.g.*, Amended Complaint 18 ¶ 43 (J.A. 33)). Even if this were true, without significant speculation, awareness of Appellant's participation in speaking engagements and the CSI, a group that seeks to "advance education" and "help support graduate students, such as [Appellant]," does not lead to the conclusion that Appellee Halper knew of Appellant's business expectancies. J.A. 33. There are no further facts in the amended complaint that explain how knowledge of mere *participation* in events or groups leads to knowledge of contractual rights or business expectancies. It is well established that speculative conclusions are insufficient to survive a motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

Additionally, Appellant claims Appellees "intentionally interfered with [her] property rights and business expectancies by, . . . actively participating in the scheme to defame" Appellant. J.A. 86. Therefore, Appellant's alleged basis for satisfying the intentional interference element is "inextricably tied to [her] underlying defamation claims." *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 538 (W.D. Va. 2019). Because the defamation claims fail, the tortious interference with contract claim fails. *See id.*; *see also* Va. Code Ann. § 8.01-247.1 ("*Every action for injury resulting from . . . defamation* shall be brought within one year after the cause of action accrues." (emphasis supplied)).

23

As a result, we affirm the district court's dismissal of Appellant's civil conspiracy and tortious interference with contract claims.

D.

Appellee Halper's Motion for Sanctions

Appellee Halper contends the district court abused its discretion by denying his motion for sanctions against Appellant and attorney Biss. The district court observed that "allegations of improper behavior" regarding attorney Biss "are undoubtedly more severe than those" regarding Appellant. J.A. 332.

Of note, this is not the first time attorney Biss's litigation conduct has earned reprimand. His history of unprofessional conduct is long. *See, e.g.*, *Nunes v. Cable News Network, Inc.*, No. 3:19-cv-889, 2020 WL 2616704, at \*2 (E.D. Va. May 22, 2020) ("It is with chagrin that the Court must begin to address this motion by observing that Plaintiff engages in ad hominin attacks against CNN and others in the Amended Compliant which the Court cannot tolerate." (alterations and internal quotation marks omitted) (quoting *Steele v. Goodman*, No. 3:17-cv-601, 2019 WL 3367983, at \*3 (E.D. Va. July 25, 2019))); *see also Nunes v. Lizza*, 486 F. Supp. 3d 1267, 1299–1300 (N.D. Iowa 2020) (requiring Biss to file "a second amended complaint . . . stripped of all such spurious allegations" and directing Biss "not to file any further public pleadings referencing such matters without first obtaining leave of the Court and showing that there is a good faith factual basis for the allegations and that they are relevant and material to some matter at issue in this litigation"). In fact, attorney Biss had his license suspended in 2009 for unprofessional conduct including breaching fiduciary duties and violating federal securities law. *See Va. State Bar*

24

*v. Biss*, No. CL07-1846 (Va. Cir. Ct. Nov. 26, 2008). And, even during his suspension period, attorney Biss failed to be forthright about his suspension status with an opposing party when engaging in negotiations on behalf of a client, resulting in an additional 30 day suspension of his license. *See In re Steven Scott Biss*, No. 09-032-078962 (Va. State Bar Disciplinary Bd. Nov. 3, 2009).

The district court chastised attorney Biss for "directing unprofessional ad hominem attacks at [Appellee] Halper and others," noting that such behavior "adds nothing but unnecessary heat to this litigation." J.A. 331. But in the end, the district court elected not to sanction attorney Biss at this point and denied the motion to sanction without prejudice. We agree with the district court's observations and endorse the court's reprimands concerning inappropriate ad hominem attacks. We conclude, however, that the district court acted within its discretion because we are not "left with the definite and firm conviction that a mistake has been committed." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 519 (4th Cir. 2018). To the contrary, the record establishes that although the district court did "not condone the [litigation] tactics" at issue, it elected to exercise caution and employ a wait-and-see approach based on post-judgment litigation. J.A. 331–32 ("Whether to impose sanctions based on litigation conduct 'ought to be exercised with great caution[.]'" (quoting *Royal Ins. v. Lynnhaven Marine Boatel, Inc.*, 216 F. Supp. 2d 562, 567 (E.D. Va. 2002)).

We leave to the district court whether it will ultimately join the chorus in sanctioning attorney Biss.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

In 1965, Gordon Moore, the co-founder of Intel, predicted that the computing power of a microchip would double every two years. This principle, which became known as Moore's Law, largely proved reliable. In fact, only recently has this growth subsided. And from the time Moore's Law was pronounced until now, we have all experienced the technology revolution, including the advent of the Internet, smart phones and social media. It is of course stating the obvious to say that our society's communication methods have been transformed.

Today, we face a variety of legal issues stemming from these new forms of communication. But we confront them largely with traditional legal principles developed during times when communication was very different. Doing so feels a bit like trying to operate a commercial farm with just a pick and a hoe.[1] Yet, until state common law

---

[1] To illustrate, one issue here is whether the third-party tweets and retweets of The Wall Street Journal and The New York Times articles that occurred within the one-year statute of limitations constitute republication of the articles that were published initially outside the period of limitations. Our best tool for addressing this issue is a case from over fifty years ago. *See Weaver v. Beneficial Fin. Co.*, 98 S.E.2d 687 (Va. 1957). *Weaver* provides that the "author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication." *Id*. at 690. Prior to the Internet, it was more difficult to show that a third party's republication was the natural and probable result of an author or originator's act. But now, people tweet and retweet articles all the time. Indeed, reporters and publishers encourage their followers to do so. In that environment, one might argue that tweeting and retweeting is the natural and probable result of publishing anything on the Internet. While I agree with Judge Thacker's analysis on this issue, this example illustrates how technology has outpaced our defamation law tools.

develops in this area, or until state legislatures enact statutes to reflect policy regarding publication in the modern era, we head out into the field with pick and hoe in hand.

I agree with most of Judge Thacker's majority opinion. I write separately on one issue. The majority concludes that The New York Times' inclusion of its May 18, 2018 article—which Lokhova alleges to be defamatory—as a hyperlink in an April 9, 2019 New York Times article is not a republication for purposes of the statute of limitations. On that issue, I disagree.[2]

To begin, let's get our terminology straight. What is a hyperlink? Merriam-Webster defines a hyperlink as "an electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or a different document." *Hyperlink*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020). Here, The New York Times, in an April 9, 2019 article co-authored by Adam Goldman, inserted a hyperlink to Goldman's May 18, 2018 New York Times article.

Our question is whether an original publisher's inclusion of a hyperlink to its own earlier article constitutes a new publication that resets the statute of limitations or whether the hyperlink is swept up in the single publication rule that provides only one statute of limitations based only on the original publication date. To answer this question, we must discern how two competing doctrines in defamation law—republication and the single publication rule—interact.

_____

[2] My disagreement should not be construed to reflect an opinion one way or the other on whether the publication itself is defamatory.

The general rule of republication "treat[s] each individual copy of a defamatory statement as a separate publication giving rise to a distinct cause of action." 1 Rodney A. Smolla, Law of Defamation § 4:93 (2d ed. 2020). In other words, when one makes a defamatory statement, the statute of limitations begins. But if the same person makes the same defamatory statement again, it is a new cause of action, and the statute begins at the time of the second statement.

In contrast, the single publication rule "evolved" because republication—particularly as it related to newspapers, magazines, radio and television—"has proved untenable for modern life." *Id*. By their very nature, many copies of newspapers and magazines are published. The single publication rule provides that with regard to defamatory forms of mass communication or aggregate publication, there is only one cause of action. This in effect, has the opposite effect of the republication doctrine—here, despite the fact a defamatory statement may be "heard or read by two or more persons," "it does not create independent actions or start the statute of limitations running anew." *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d. 909, 918 (E.D. Va. 2004). Rather, the action "accrues at the single date of first publication." 53 C.J.S. Libel & Slander; Injurious Falsehood § 98 (2021).[3]

---

[3] Virginia has not expressly adopted the single publication rule. But we have upheld application of the single publication rule to the publication of books in a case applying Virginia law, *Morrissey v. William Morrow & Co., Inc.*, 739 F.2d 962 (4th Cir. 1984), noting "[a]s to any single publication, (a) only one action for damages can be maintained; (b) all damages suffered in all jurisdictions can be recovered in the one action; and (c) a judgment for or against the plaintiff upon the merits of an action for damages bars any other action for damages between the same parties in all jurisdictions." 739 F.2d at 967 (Continued)

29

But how these two doctrines, republication and single publication, fit together is murky at best. *Compare Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 n.3 (1984) ("The 'single publication rule' is an exception to this general rule [of republication]."), *with Eramo v. Rolling Stone, LLC.*, 209 F. Supp. 3d 862, 879 (W.D. Va. 2016) ("It is less clear how the republication exception to the single publication rule applies in the context of electronic media."). Nevertheless, we must grapple with the interrelation of these principles to answer the questions presented to us.

So back to The New York Times' inclusion of a hyperlink of its prior article in a subsequent article. The republication doctrine applies where "a defendant edits and retransmits the defamatory material or redistributes the material with the goal of reaching a new audience." *Eramo*, 209 F. Supp. 3d at 879. Thus, whether or not there were edits or changes to the article in the hyperlink, republication still applies when the alleged defamatory material contained in the hyperlink was "redistribute[d] with the goal of reaching a new audience." *Id*. And whether a hyperlink seeks to do just that is unanswered in Virginia law.

Two circuits have declined to find hyperlinks amount to republication. *See Clark v. Viacom Int'l Inc.*, 617 Fed. App'x 495, 506 (6th Cir. 2015) ("[R]un-of-the-mill hyperlinks . . . typically demonstrate neither the intent nor the ability to garner a wider audience than the initial iteration of the online statement could reach."); *In re Philadelphia Newspapers,*

---

(quoting Restatement (Second) of Torts § 577A(4) (1977)). Besides, the papers agree that the single publication rule applies here.

*LLC*, 690 F.3d 161, 174 (3d Cir. 2012), *as corrected* (Oct. 25, 2012) ("Several courts specifically have considered whether linking to previously published material is republication. To date, they all hold that it is not based on a determination that a link is akin to the release of an additional copy of the same edition of a publication because it does not alter the substance of the original publication."). Some courts have said a hyperlink is not unlike a footnote. *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017) (describing a hyperlink as "the twenty-first century equivalent of the footnote").

But context matters. Hyperlinks can be quite different than footnotes. While a footnote may contain a web address or hyperlink, its primary purpose is to identify a prior publication as a source. That is different, however, from what we have here. As alleged, The New York Times hyperlinked Goldman's earlier article not as a source, but rather via the provocative phrase "accuse the F.B.I." It is, therefore, reasonable to infer that the hyperlink was not used like a footnote at all. Rather, it was used as "clickbait," drawing readers to another New York Times article with a mere click of the mouse. Here, Lokhova has plausibly alleged that rather than using the hyperlink as a citation, The New York Times used it as a means of redistributing previous material with the goal of expanding its readership.

Likewise, this is not a situation where the acts of third parties, over which a publisher has no control, can enlarge its period of limitations. To the contrary, she alleges The New York Times consciously decided to incorporate its prior article in total into its

31

later article. That does not mean this decision was wrong. That does not mean the statement was defamatory. But it should mean that when The New York Times elected to republish its article, it does not get the protection of the single publication rule. Otherwise, the single publication rule would effectively permit publishers to hyperlink their way to consequence-free promotion.

The Internet has many benefits, and there is nothing wrong with publishers taking advantage of them to increase readership. But, as with most things in life, along with benefits often come burdens. Accepting Lokhova's allegations as true, The New York Times decided to use hyperlink technology in its newer article to expand exposure of its old article. In so doing, it republished the old article and, thus, should be subject to a new statute of limitations. For this reason, I dissent in part.